946 So.2d 988 (2006)
William CODAY, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1920.
Supreme Court of Florida.
October 26, 2006.
Rehearing Denied January 8, 2007.
*992 Carey Haughwout, Public Defender and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
William Coday appeals his conviction for first-degree murder and a sentence of death imposed in the circuit court for the Seventeenth Judicial Circuit in and for Broward County, Florida. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons which follow, we affirm the judgment but vacate the sentence and remand this case for a new sentencing proceeding before the trial judge.

FACTUAL AND PROCEDURAL HISTORY
William Coday[1] testified that he had an on again, off again, intimate relationship with the victim, Gloria Gomez, from January 1996 to June 1997. In early June 1997, they had an argument in which he accused her of having an affair with another man. After this argument, she broke off contact with him and moved out of his apartment in Fort Lauderdale and in with some friends in Miami. For over a month, he attempted repeatedly to reconcile with her. Desperate to contact her, he left an urgent message with her family friend stating that he was going to be hospitalized. In response, she called him that evening. During the conversation, he lied to her and told her that he had cancer. She promised to visit him on Friday, July 11, 1997, between 10:00 a.m. and 11:00 a.m.
She arrived at his home at or near 1:00 p.m. on July 11, 1997. He was agitated because she was late. They first discussed his medical situation. Coday then shifted the focus of their conversation to his desire to have her back. He led her into his bedroom where the conversation continued. When she told him that she did not love him in the manner that he had thought and that she had to get her things from his apartment, he flew into a rage and punched her. He then picked up a hammer and struck her, causing her to fall. While in the process of striking her again, he lost his balance and fell on top of her. She managed to grab the hammer out of his hand. However, he found another hammer and continued striking her. Coday then went to the kitchen, retrieved a knife, and began stabbing her. Finally, he drove the knife into her throat and held it there until she died. The cause of death was multiple blunt and sharp force trauma injuries.
The trial court found that the murder was especially heinous, atrocious, or cruel and gave this aggravating circumstance great weight. According to Dr. Eroston Price, the Associate Broward County Medical Examiner who performed the autopsy, there were 144 wounds inflicted on her, *993 fifty-seven of which were blunt force trauma injuries consistent with being struck by the flat and claw side of a hammer. The remaining eighty-seven wounds were sharp force wounds consisting of forty-one stab wounds (i.e., the wounds were deeper than they were long) and forty-six incise wounds (i.e., the wounds were longer than they were deep). She had multiple defensive wounds on the palms of her hands and on her arms from blocking the blows and grabbing for a weapon. Dr. Price testified that she was alive for all but one of the 144 stab wounds and hammer blows. The brutality of the attack, coupled with her defensive wounds, bodily movements, and blood spatter, suggested that she knew she was fighting for her life and was aware of her impending death.
The trial court considered the following statutory mitigating circumstances: (1) the defendant has no significant history of criminal activity (no weight); (2) the defendant committed the crime while under the influence of extreme mental or emotional disturbance (moderate weight); and (3) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (no weight). In giving extreme mental or emotional disturbance moderate weight, the trial court found that this statutory mitigating factor had been established at the Spencer[2] hearing through the testimony of six mental health experts. Each of the doctors had conducted interviews with Coday and reviewed court documents, previous psychological evaluations, and police reports. Several of the mental health experts had also interviewed his family, friends, and coworkers, and administered psychological testing. Thus, the trial court found that the record established this statutory mitigating circumstance by a preponderance of the evidence.
The trial court also considered the following nonstatutory mitigating circumstances: (1) the crime was committed while Coday was under the influence of a mental or emotional disturbance (moderate weight); (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired (no weight); (3) he exhibited signs of mental or emotional disturbance at a very early age (no weight); (4) while in county jail, he was depressed and suicidal and had willingly taken several prescribed medications which helped him with the stress of incarceration and his mental health issues (minimal weight); (5) he voluntarily returned to the United States and surrendered to law enforcement (minimal weight); (6) he cooperated with the police upon his arrest (minimal weight); (7) he voluntarily confessed to the crime after being warned of his right to remain silent and without asking for, and without assistance of, counsel (minimal weight); (8) he voluntarily consented to a search and confiscation of his belongings (minimal weight); (9) he had a good employment history and record (moderate weight); (10) he was raised in an environment of instability and emotional abuse (no weight); (11) he was severely sick as an elementary school student and missed a great deal of school because of his chronic illnesses, thereby missing out on many crucial socialization and learning experiences as a result (little weight); (12) his parents' marriage ended in divorce, traumatizing him (no weight); (13) he wrote a novel to tell the world about his despair over his relationship with Gomez and intended to leave it behind when he took his own life out of guilt over what he had done (no weight); (14) it is highly unlikely that he will endanger *994 others while serving a sentence of life in prison (little weight); (15) society would be protected by him serving a life sentence in prison (little weight); (16) he will use his foreign language skills to assist needy individuals who seek to learn English or function here, and thus he can still be a productive member of society (little weight); (17) he is a voracious reader, has already caused two former inmates of the Broward County Jail to seek assistance in learning to read once released, and will help other inmates in the future turn their lives around (little weight); and (18) he has expressed sincere regret and remorse for his crimes (little weight).
In sentencing Coday to death, the trial court gave great weight to the jury's nine-to-three death recommendation. The trial court found that the aggravating factor, heinous, atrocious or cruel, was proven beyond a reasonable doubt and outweighed the mitigating factors found to exist.
Coday now appeals both the judgment and sentence.

DISCUSSION

Proffered Heat of Passion Instruction
Coday argues that the trial court abused its discretion in denying his proffered jury instruction on heat of passion by finding that the standard jury instructions appropriately addressed this subject. He states that this instruction would have resulted in the jury finding him guilty of second-degree murder. Furthermore, he asserts that an accused is entitled to have the jury instructed on this theory of defense and that the trial court effectively denied him this right when it denied the proffered jury instruction. Thus, the issue that we must decide is whether the standard jury instruction on excusable homicide adequately explains heat of passion or whether the trial court should have given Coday's proffered special jury instruction on heat of passion.
This Court has held that "[d]ecisions regarding jury instructions are within the sound discretion of the trial court and should not be disturbed on appeal absent prejudicial error." Goldschmidt v. Holman, 571 So.2d 422, 425 (Fla.1990). However, "[a] defendant is entitled to an instruction as to any valid defense supported by evidence or testimony in the case." State v. Weller, 590 So.2d 923, 927-28 (Fla.1991). "The jury and not the trial judge determines whether the evidence supports the defendant's contention." Mora v. State, 814 So.2d 322, 330 (Fla. 2002). Nevertheless, "[w]hile a defendant is entitled to have the jury instructed on his theory of defense, the failure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards." Stephens v. State, 787 So.2d 747, 755 (Fla.2001).
This case is both factually and legally similar to Kilgore v. State, 688 So.2d 895 (Fla.1996), where we affirmed the trial court's denial of a special instruction on heat of passion. In Kilgore, the appellant was serving a life sentence at the Polk Correctional Institution for first-degree murder and kidnapping when he stabbed his homosexual lover to death outside of his cell with a homemade shank knife. Id. at 896-97. The trial court denied Kilgore's requested special jury instruction on heat of passion, which stated that a person acting under the heat of passion is incapable of premeditation in some circumstances. Id. at 897. The trial judge instead utilized the standard jury instruction of excusable homicide to explain heat of passion. Id. In finding that the trial court did not err, we stated:
This Court has acknowledged that the standard jury instructions are sufficient *995 to explain premeditation. Spencer v. State, 645 So.2d 377, 382 (Fla.1994). We also have ruled that the trial court does not necessarily abuse its discretion in denying a special heat-of-passion instruction. Kramer v. State, 619 So.2d 274, 277 (Fla.1993). After viewing these facts, we conclude that there is no indication that the trial court erred by refusing the requested instruction. The necessary elements of premeditation were presented with the standard instruction and the trial court was well within its prerogative to refuse a separate, and possibly confusing, instruction.
Id. at 898.
In the instant case, the trial court followed this Court's precedent in Kilgore and found that the standard jury instruction on excusable homicide was sufficient to explain heat of passion in the context of premeditation. Since Kilgore is factually similar to the instant case in that both cases deal with the denial of special jury instructions on heat of passion to negate premeditation, we find that the trial court properly exercised, and did not abuse, its discretion.

Jury Instruction on Premeditation
Coday argues that the trial court erred in giving the standard instruction on premeditation. The State counters that the issue was not preserved and that the giving of the instruction was proper. We find no error in giving the standard instruction. Claims not raised at trial are procedurally barred unless they present a question of fundamental error. See Mordenti v. State, 630 So.2d 1080 (Fla.1994). "Issues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial." Overton v. State, 801 So.2d 877, 901 (Fla. 2001); see also State v. Delva, 575 So.2d 643, 644 (Fla.1991) (holding that instructions are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred).
In the instant case, Coday filed a pretrial motion on July 10, 1998, objecting to the use of the standard premeditation instruction. However, he did not object to the use of the standard instruction on premeditation at either the charge conference on April 8, 2002, or after the trial court had given the standard instruction on premeditation to the jury on April 9, 2002. Hence, this issue is not preserved for appellate review. See Morrison v. State, 818 So.2d 432, 456 n. 16 (Fla.2002) (finding that the defense's pretrial objection to a jury instruction on the "vulnerable victim" statutory aggravator was not preserved for appellate review since defense counsel did not object to the instruction when it was given at trial); Patton v. State, 878 So.2d 368, 379 (Fla.2004) (finding that although the defense moved to suppress evidence before the trial, the objection was not preserved since the defense failed to object to the admission of the evidence at trial); Maharaj v. State, 597 So.2d 786, 790 (Fla.1992) (stating that admission of certain newspaper articles at trial was not preserved for appellate review where court denied defendant's pretrial motion in limine to exclude the articles and defendant failed to object when the articles were offered at trial).
However, even if we were to entertain Coday's claim, it is clear that there was no error because the trial court gave the standard jury instruction on premeditation. See Kilgore, 688 So.2d at 898 (holding standard jury instructions are sufficient to explain premeditation); Goldschmidt, 571 So.2d at 425 (finding decisions regarding jury instructions are within the sound discretion of the trial court and should not be disturbed on appeal absent prejudicial error).

*996 Denial of Motion for Judgment of Acquittal/Sufficiency of Evidence
Coday moved for a judgment of acquittal on the ground that the State failed to prove the element of premeditation, and the trial court denied this motion. A motion for judgment of acquittal should not be granted by the trial court unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law. See Pearce v. State, 880 So.2d 561, 571 (Fla.2004).
Where there is room for a difference of opinion between reasonable people as to the proof or facts from which an ultimate fact is to be established, or where there is room for such differences on the inferences to be drawn from conceded facts, the trial court should submit the case to the jury. Id.[Taylor v. State, 583 So.2d 323 (Fla.1991)] Once competent, substantial evidence has been submitted on each element of the crime, it is for the jury to evaluate the evidence and the credibility of the witnesses. Davis v. State, 703 So.2d 1055, 1060 (Fla.1997); see also Hufham v. State, 400 So.2d 133, 135-36 (Fla. 5th DCA 1981).
Id. at 572.
The trial court did not err in denying Coday's motion for judgment of acquittal since there was an abundance of evidence establishing that the murder was premeditated and not committed in the heat of passion. The evidence demonstrates that at 4:54 p.m. on July 10, 1997, the day before the murder, Coday reserved a flight which was scheduled to depart from John F. Kennedy Airport in New York on July 12, 1997, and scheduled to arrive at Charles DeGaulle Airport in Paris, France. On July 10, he withdrew $6000 from his bank account at City County Credit Union and bought $2000 worth of traveler's checks. He purposefully lured Gomez to his home by lying to her and stating that he was dying of skin cancer because she had rejected all of his other attempts to meet with her. In his signed, written confession contained in the exhibits, he states that he attacked Gloria Gomez with one hammer. When he slipped, she grabbed that hammer from him. He then retrieved another hammer and continued hitting her. With these two hammers, he hit her fifty-seven times. However, he finished his brutal assault on her with a knife which he obtained by leaving her body in the bedroom and walking into the kitchen. Once he returned to the bedroom with a knife from the kitchen, he began attacking her again, stabbing her eighty-seven times.
Because he had time to consciously reflect upon his actions and realize that he was committing a murder, this murder was premeditated. See Sochor v. State, 619 So.2d 285, 289 (Fla.1993) (holding that defendant's heat of passion claim was insufficient to preclude a finding of premeditation when the defendant briefly stopped his assault on the victim in order to shout at his codefendant and then resumed the assault). The trial court did not err in denying Coday's motion for judgment of acquittal on the issue of premeditation.

Denial of Motion to Suppress
Coday next argues that because he was an overnight guest at the residence of his former wife, Tooska Amiri, at the time of his arrest, he had a reasonable expectation of privacy in that residence. He asserts that his arrest was unlawful since the police entered the residence and arrested him without a warrant, without exigent circumstances, and without Amiri's permission. Therefore, he claims that his arrest was unlawful and the trial court erred in denying his motion to suppress the evidence *997 which was the fruit of his illegal arrest and detention.
In Connor v. State, 803 So.2d 598, 608 (Fla.2001), we indicated that a trial court's ruling on a motion to suppress is entitled to a presumption of correctness regarding its determination of historical facts. However, appellate courts must review independently mixed questions of law and fact that are determinative of constitutional issues arising under the fourth and fifth amendments to the United States Constitution and article I, section 9 of the Florida Constitution. A review of the record indicates the trial court did not err in denying Coday's motion to suppress.
Detective Vincent Greco, a former police officer who worked in the Queens, New York Homicide Squad and who apprehended Coday, testified concerning the events surrounding Coday's capture. Greco testified that at approximately 8:00 a.m. on October 15, 1997, he received a call from a woman who stated that a man who was wanted for a homicide in Florida was staying at her friend's house located across the street from the McDonald's on Metropolitan Avenue. Greco asked his immediate supervisor, Sergeant John Russell, to accompany him to the McDonald's to meet the female informant. When they pulled up to the phone booth outside the McDonald's, Greco identified himself to the woman who had called him. She stated that her name was Christine Woods and that a man who was wanted for a homicide in Florida and who had also committed another murder years ago was staying at her friend's apartment across the street. She described him as a large, white male with glasses who had been featured on the television show, America's Most Wanted.
Detective Greco and Sergeant Russell had Woods call her friend, Coday's former wife, Tooska Amiri, and lure her out of the apartment by asking her if she wanted some coffee. Five minutes later, Woods met Amiri at the door to her apartment and asked her if there was anyone else in the apartment besides Coday. Amiri stated that there was no one else in the apartment.
Before entering the apartment, Greco and Russell were given the name of the suspect, William Coday, but did not run a National Crime Information Center inquiry on Coday and did not have either an arrest or a search warrant. The only information that Greco and Russell possessed indicating that Coday had committed a crime was Woods' and Amiri's statements. Though Amiri never expressly stated that Greco and Russell had her permission to enter her apartment, she pointed upstairs and stated that Coday was in her apartment. Greco and Russell took this to mean that she had given them permission to enter her apartment. Therefore, they went upstairs where they found the front door to the apartment open and Coday lying on the floor in a back bedroom. Coday identified himself. Greco advised Coday of his rights and escorted him out of the apartment. Russell followed them out, carrying a bag which Coday said was his.
Once Greco and Russell took Coday to the police station, they brought him into an interrogation room and advised him of his rights for a second time. At that point, the Queens homicide squad received a faxed copy of Coday's arrest warrant from Fort Lauderdale, Florida. Coday began to talk to Greco about Gomez's murder in Florida, and he gave a written statement confessing to the murder. Greco had Coday stop writing this statement when he was advised that Coday's family had retained counsel, and at that point, Greco, Russell, and Coday all signed the statement. At no time during the interrogation did Coday ask to speak to an attorney or *998 state that he wanted the interrogation to end. He was not threatened, coerced, or tricked into giving the signed, written statement. The interrogation was neither video- nor audio-taped.
Sergeant Russell's testimony was similar. Russell added that when they arrived at the police station, the contents of Coday's bag were removed and inventoried. The only thing that Coday said when his bag was being searched and inventoried was that the wallet they found was Gomez's wallet and that he did not take it for personal gain. He said that he took it in order to determine the identity of the person Gomez was dating.
Detective Mike Walley of the Fort Lauderdale Police Department, who was assigned to the investigation of Gloria Gomez's murder, corroborated Greco and Russell's story. He stated that at 8:38 a.m. on October 15, 1997, he received a phone call from Amiri, who told him that the police and Coday were at her residence and that Coday had returned to the United States in order to surrender. Walley testified that he spoke with Coday and asked him if he was hurt or injured in any way. Coday said that he was unharmed and that he had returned to surrender so that justice could be served. Walley then spoke with Sergeant Russell and informed him that there was an arrest warrant charging Coday with murder in Broward County.
Based upon the testimony of Detective Greco, Sergeant Russell, and Detective Walley, the trial court denied the defense's motion to suppress. In support of its order, the trial court supplied the following reasons:
The State has shown that, although Detective Greco did not have actual knowledge of the Florida arrest warrant, a valid Florida arrest warrant existed. Probable cause for the arrest existed, he just did not know about it. He was told of the existence of the warrant after he returned to Precinct 112 and before the interview with the Defendant took place. Even if no valid warrant existed, the police had information that a potential fugitive escaping murder charges was in a nearby apartment. When Tooska Akiri [sic] opened the downstairs door and said that the Defendant was upstairs, the officers received the owner's consent to enter. The upstairs door was open. The Defense provided no contradictory evidence. Christine Woods told them that she was concerned about the safety of her friend, Tooska Akiri [sic]. Because of Ms. Woods' concern, an exigent circumstance existed. A potentially dangerous person was alleged to be in the apartment. Because he might be a fugitive, he could potentially flee before a valid warrant was confirmed or backup officers could be called. This Court finds that the officers' entry of the apartment was lawful. The arrest of the Defendant and subsequent seizure of his effects in the bag that the Defendant claimed was his is also valid. The bag was lawfully searched incident to the lawful arrest or as a post arrest inventory. This Court finds that the incriminating physical evidence is admissible.
. . . .
Based on the totality of the circumstances, which include, but are not limited to: the evidence presented, the witnesses' testimony at the hearing, and the Defendant's written statement, this Court finds that the Defendant's waiver of his rights, "was voluntary, in the sense that it was the product of free and deliberate choice rather than by intimidation, coercion or deception." [Sliney v. State, 699 So.2d 662, 668 (Fla.1997).]
Additionally, this Court finds that the record reflects that the written waiver of *999 the Defendant's Miranda rights ". . . was executed with [the Defendant's] full awareness of the nature of the rights being abandoned and the consequences of their abandonment." Id. at 688[668]. The record establishes that the Defendant was advised of his Miranda rights from a card during his arrest and from the Miranda rights waiver form before questioning and the writing out of his statement. The Defendant was aware of the fact that he was implicating himself, and at no time did he request cessation of the questioning, or an attorney. When an attorney hired by the Defendant's family called the precinct, Detective Greco stopped the statement. The State has shown, by a preponderance of the evidence, that the confession, statements and admissions were freely and voluntarily given.
In Rolling v. State, 695 So.2d 278 (Fla. 1997), this Court explained "exigent circumstances" as follows:
The kinds of exigencies or emergencies that may support a warrantless entry include those related to the safety of persons or property, see Richardson v. State, 247 So.2d 296 (Fla.1971), as well as the safety of police. Jones v. State, 440 So.2d 570 (Fla.1983). Of course, a key ingredient of the exigency requirement is that the police lack time to secure a search warrant. Police may not enter and search for dangerous instrumentalities or other evidence, even if they have probable cause to believe it is on the premises or otherwise subject to removal or destruction, if they have time to obtain a warrant and then enter under that authority.
Id. at 293.
In the instant case, there were exigent circumstances sufficient to justify this warrantless entry into the apartment and the seizure of the defendant. Woods had informed Greco and Russell that a man wanted for a murder in Florida was hiding in her friend's apartment. She expressed concern for her friend's safety. Therefore, Greco and Russell acted properly by having Woods lure her friend, Amiri, out of the apartment and into safety. When Amiri was with Greco and Russell, she confirmed Woods' story that Coday was in her apartment and that he was wanted for murder in Florida. Greco and Russell were concerned about their safety and the safety of Woods, Amiri, and the neighboring residents. Thus, exigent circumstances existed, and they had to act quickly in order to seize Coday before he either escaped or hurt someone. Because of that exigency, there was no time for them to obtain a warrant. Hence, their warrantless entry was proper.
We also find that Coday's signed, written statement was obtained properly. Prior to speaking with Greco and Russell at the police station, Coday was advised of his rights two times, once at Amiri's apartment and again at the police station prior to interrogation. He told Walley that he had returned to the United States in order to surrender and to see to it that justice was served. At no time during the interrogation was he coerced into making a statement, promised anything in return for making a statement, or forced to proceed without consulting an attorney. He neither requested counsel nor asked that the interrogation end. When Greco was advised that his family had secured counsel, Greco told him to stop writing and ended the interrogation. Under the totality of the circumstances, the trial court properly denied Coday's motion to suppress.

Admission of Coday's Signed, Written Confession into Evidence
Coday objected to the introduction of his signed, written confession on the ground *1000 that the State had not laid the foundation that it was authentic. The trial court overruled the objection and admitted the document. Coday asserts that this was error under section 90.901, Florida Statutes (1997), which requires authentication of a document as a condition precedent to its admissibility.
While section 90.901 requires the authentication or identification of a document prior to its admission into evidence, the requirements of this section are satisfied by evidence sufficient to support a finding that the document in question is what its proponent claims. See § 90.901, Fla. Stat. (1997). Authentication or identification of evidence may include examination of its appearance, contents, substance, internal patterns, or other distinctive characteristics in conjunction with the circumstances. See State v. Love, 691 So.2d 620 (Fla. 5th DCA 1997). In this instance, the trial court did not abuse its discretion in finding that Coday's confession was authentic, for there was an abundance of evidence that supported the trial court's finding that the signed, written statement was drafted by Coday. Both Detective Greco and Sergeant Russell testified that they witnessed Coday write and sign this statement, and in turn, they both signed the statement after Coday. The details of the attack on Gomez contained within the statement are consistent with the injuries to Gomez's body as described in the testimony of Dr. Eroston A. Price, the Associate Medical Examiner for the Broward County Medical Examiner's Office, who performed the autopsy. In the statement, the author wrote that he took Gomez's wallet for the purpose of trying to identify whom she was dating. This is consistent with Sergeant Russell's testimony that when the police were removing Gomez's purse from Coday's bag, Coday stated that he had taken Gomez's wallet not for personal gain but for the purpose of trying to identify whom she was dating.
Additionally, in the statement, the author states that he drove Gomez's car to the Miami airport after the murder, flew to Paris, and had in his possession $5000 to $6000 which he had withdrawn from his bank account two days prior. This is consistent with Coday's actions as described in the testimony of Detective Carol Coval, a Fort Lauderdale Police Department Crime Scene Investigator; Kirk Demyan, a supervisor at the Delta Airlines' ticket counter; and Salisha Ramdass, a former customer service representative at the City County Credit Union. Lastly, the handwriting of the 200-page confession, titled "the Crepusculo," which was found in Coday's bag when he was apprehended, matches the handwriting in the signed, written statement.
Thus, there was sufficient evidence in the record to support the trial court's conclusion that the statement was authentic, and the trial court did not abuse its discretion in admitting this confession into evidence. See, e.g., Hunt v. State, 746 So.2d 559 (Fla. 1st DCA 1999).

Ability to Conform Conduct
Coday argues the trial court erred in failing to find and give any weight to the mitigating factor of lack of ability to conform his conduct to the requirements of the law at the time of the homicide. We begin our discussion of this issue with a review of the basic principles that have evolved over the years on the proper analysis that must be accorded evidence that is offered in mitigation of a possible death sentence. Generally, "the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard." Blanco v. State, 706 So.2d 7, 10 (Fla.1997). However, while the trial court can determine the weight to be given to a particular mitigator, *1001 the trial court must find as a mitigating circumstance any proposed factor that is both reasonably established by the greater weight of the evidence and mitigating in nature. See Campbell v. State, 571 So.2d 415, 419 (Fla.1990). More particularly, in Campbell we said:
The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence: "A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established." Fla. Std. Jury Instr. (Crim.) [7.11 Penalty Proceedings Capital Cases]. The court must next weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance. Although the relative weight given each mitigating factor is within the province of the sentencing court, a mitigating factor once found cannot be dismissed as having no weight.
Id. at 419-20 (footnotes omitted).
Over the years that followed Campbell, we further defined the parameters of the trial court's discretion in considering mitigating factors. For example, in Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990), after citing Campbell with approval, we explained:
Thus, when a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a defendant's claim that a mitigating circumstance has been proved, however, provided that the record contains "competent substantial evidence to support the trial court's rejection of these mitigating circumstances." Kight v. State, 512 So.2d 922, 933 (Fla.1987), cert. denied, 485 U.S. 929, 108 S.Ct. 1100, 99 L.Ed.2d 262 (1988); Cook v. State, 542 So.2d 964, 971 (Fla.1989). . . .
In Nibert this Court found the trial court improperly rejected statutory and nonstatutory mitigating circumstances, including the factor of physical and psychological abuse for many years during the defendant's youth. The trial court rejected the factor because the defendant was twenty-seven years old at the time of the murder and had not lived with his mother since the age of eighteen. This Court said that the fact that the abuse had come to an end did not diminish the fact that the defendant had suffered more than a decade of abuse. We opined that to hold otherwise would mean that a defendant's history of child abuse would never be accepted as a mitigating factor. Therefore, we concluded that because Nibert had presented a large quantum of uncontroverted mitigating evidence and that there was no competent, substantial evidence in the record refuting the mitigating evidence, the trial court erred in failing to find and weigh a substantial number of statutory and nonstatutory mitigating circumstances. See also Mansfield v. State, 758 So.2d 636 (Fla. 2000) (citing with approval Campbell and Nibert); Mahn v. State, 714 So.2d 391, 400-401 (Fla.1998) (citing with approval Nibert and Kight). Thus, a trial court can only reject uncontroverted mitigating evidence as being unproven if there is competent, substantial evidence to support that rejection.
We have also addressed the trial court's discretion when dealing with expert opinion testimony. In Foster v. State, 679 So.2d 747, 755 (Fla.1996), we said that *1002 even uncontroverted expert opinion testimony may be rejected if that testimony cannot be squared with the other evidence in the case. Accord Morton v. State, 789 So.2d 324, 330 (Fla.2001). Recently, we applied these principles in a situation, similar to the one that is now before this Court, where the defendant contended that the trial court erred in failing to find and weigh evidence that he suffered from organic brain damage. See Crook v. State, 813 So.2d 68 (Fla.2002). During the penalty phase in Crook, evidence was presented by three medical experts that Crooks suffered from brain damage which impaired his ability to control his impulses. The experts also stated that Crook's brain damage was exacerbated by his use of alcohol and drugs at the time of the murder. This brain damage was substantiated by objective testing done by the experts. In reversing the trial court's rejection of this mitigating evidence, we said:
In contrast to Robinson,[3] the trial court in the present case did not find and weigh Crook's brain damage as a valid mitigating circumstance, and rejected its connection to this crime, even though three defense experts, two of whom specialized in brain injuries, presented uncontroverted testimony that Crook suffered from frontal lobe brain damage that established a statutory mental mitigator. Perhaps most significantly, unlike the experts in Robinson, the expert testimony in this case also explained the causes and origins of Crook's frontal lobe brain damage and established that there was a causal link between Crook's brain damage and the homicide.
Accordingly, we hold that the trial court erred in rejecting the uncontroverted evidence of Crook's brain damage. We conclude that based upon the expert testimony, there was a "reasonable quantum of competent, uncontroverted evidence" establishing its existence and its connection to the crime in question. Spencer [v. State], 645 So.2d [377, 385 (Fla.1994)]. Certainly, this is not a case where there was little or no evidence presented to support a finding of brain damage, see Shellito v. State, 701 So.2d 837, 844 (Fla.1997), or where the expert testimony pertaining to a mitigating circumstance was equivocal. See Robinson, 761 So.2d at 276-77; see also Franqui v. State, 699 So.2d 1312, 1326 (Fla.1997). . . . Thus, given the unrefuted expert testimony in this case, we conclude that the trial court erred in failing to find and weigh the evidence of Crook's brain damage in its assessment of statutory mental mitigation.
Id. at 75-76.
Not only have we addressed the issue of when trial courts should consider and find certain mitigating evidence to be established, but we have also addressed the trial court's discretion in the weighing process. While adhering to the basic premise that the weight to be given a mitigating circumstance is addressed to the sound discretion of the trial court, we refined that proposition in Trease v. State, 768 So.2d 1050 (Fla.2000), by holding that in some instances a trial court could give no weight to a mitigating circumstance. In Trease, a case involving the question of whether a trial court could give little or no weight to a nonstatutory mitigating circumstance, we receded from Campbell to the extent that Campbell would not have allowed a trial court to give no weight to a mitigating circumstance once that circumstance *1003 was established. We further explained that a mitigating circumstance may be given no weight based on the unique facts of a particular case, such as when a defendant demonstrates he was a drug addict twenty years prior to the murder and the prior drug addiction has no real bearing on the present crime. Id. at 1055.
In summary, we have established a number of broad principles for the trial courts to use in evaluating the mitigating evidence offered by defendants. A trial court must find as a mitigating circumstance each proposed factor that has been established by the greater weight of the evidence and that is truly mitigating in nature. However, a trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection. Even expert opinion evidence may be rejected if that evidence cannot be reconciled with the other evidence in the case. Finally, even where a mitigating circumstance is found a trial court may give it no weight when that circumstance is not mitigating based on the unique facts of the case.
In the case now before us, the trial court stated that the statutory mitigating circumstance of Coday's inability to conform his conduct to the requirements of the law had not been established. Initially, it appears that the trial court confused the standard for insanity with the mental mitigation in question. The trial court stated that the "testimony of the mental health experts does not convince the Court that the Defendant is relieved of accountability for his conduct, or otherwise, was not aware of the consequences of his actions upon Gloria Gomez."[4] The trial judge relied on evidence that Coday had conducted himself without incident since his return from Germany and stated that because Coday could conform his conduct for so many years, he must have had the capacity to follow and abide by the law at the time of the homicide.
However, six defense mental health experts testified that Coday was unable to conform his conduct to the requirements of the law at the time of Gomez's murder. The Stated presented no expert testimony in rebuttal. Dr. Allan Goldstein, a clinical and forensic psychologist; Dr. David Shapiro, a professor of psychology and forensic psychologist; Dr. William Vicary, a psychiatrist; Dr. M. Ross Seligson, a licensed psychologist; Dr. Lenore Walker, a clinical and forensic psychologist; and Dr. Martha Jacobson, a clinical and forensic psychologist, testified at the penalty phase or at the Spencer hearing that Coday satisfied this statutory mitigating circumstance. All the doctors testified concerning their visits with Coday and the various psychological tests that were administered. All found Coday to be suffering from some form of severe depression with psychotic features or borderline personality disorder or both.
Dr. Goldstein essentially stated that Coday loses control when he is faced with extreme stress in his personal relationships. His psychosis is triggered when he *1004 feels rejected, and Coday felt rejected when the victim in this case told him that she did not love him. At that point Coday's emotions of resentment and rage overpowered his ability to reason. Dr. Goldstein stated that Coday was either not engaged in thinking or that thoughts were not registering. Dr. Goldstein opined that Coday went into a dissociative state, described as an out-of-body state, where the defendant was aware of what he was doing but could not control it. The doctor further opined that Coday's suicide attempt while in jail also occurred during a psychotic episode brought on when he received divorce papers from his wife.
Dr. Shapiro also stated that Coday viewed the victim's statement that she did not love him as rejection, which brought on active psychosis. Dr. Shapiro opined that Coday was actively psychotic after receiving the divorce papers. In keeping with the other doctors' testimonies, Dr. Vicary stated that Coday gets into intense emotional situations and when they do not work out he has feelings of abandonment. Dr. Seligson testified that Coday's relationships are based on fantasy and when the relationships unravel Coday likewise unravels and deteriorates into a dissociative state. Dr. Seligson further stated that when Coday's relationship with the victim unraveled, his condition deteriorated on the day of the murder.
Despite finding that Coday was highly intelligent, Dr. Walker found the defendant to be mentally ill. She stated that Coday lived a very contained, constrictive life, and when emotions got too high, he could not control them and deteriorated into a psychotic state. Dr. Walker opined that Coday felt rejected by the victim, and that he equated laughing at him with an incident from his childhood where other children laughed at him and locked him in an unused freezer. Because of the situation with the victim, Coday was unable to contain himself and an explosion was unleashed, with no cognitive ability to contain it. Dr. Walker believed that this was the same situation that occurred when Coday was served with divorce papers. Coday's attempted suicide was the same type of violent reaction, but it was released on himself. Lastly, Dr. Jacobson opined that Coday had a fantasy view of his relationship with the victim. When she said she did not love him, it brought on feelings of abandonment that triggered Coday's disintegration into depression and then psychosis.
As noted above, the State did not offer any expert witnesses to refute this testimony. The evidence relied upon by the State to rebut the testimony of the defense experts was the testimony of lay witnesses who had interacted with Coday prior to Gomez's murder. The lay witnesses who personally knew Coday testified that from September 12, 1978, when Coday was arrested for the murder of Lisa Hullinger in Germany, until the murder of Gloria Gomez on July 11, 1997, Coday led a lawful existence. These witnesses indicated that Coday had numerous romantic relationships during this time frame and was married twice. The witnesses also said that Coday was well liked and had numerous friends. One of Coday's coworkers testified that he was meticulously punctual, reliable as an employee, and had attended the University of Michigan where he obtained a degree in order to become a librarian. By all accounts of these lay witnesses, Coday was able to conform his conduct to the requirements of the law.
We conclude, under these circumstances, that it was error for the trial court to find that this statutory mitigator had not been established. As we said in Campbell, "The court must find as a mitigating circumstance each proposed factor that is mitigating *1005 in nature and has been reasonably established by the greater weight of the evidence." 571 So.2d at 419. Six mental health experts testified that Coday was not able to conform his conduct to the requirements of the law at the time of the offense. Their testimony not only indicated that the mitigating circumstance existed but tied that circumstance to the defendant's mental illness and the facts of this case. They essentially said that, while the defendant could normally conform his conduct, he goes into a dissociative state where he is unable to conform his conduct when he is faced with rejection in a personal relationship. The evidence offered by the State to counter this mitigation evidence can be squared with the expert testimonies. The lay witnesses believed Coday could conform his conduct because he had lived for a number of years without incident. They related that Coday had several romantic relationships during this twenty-year period, including two marriages. However, none of these witnesses recited any stressful relationship-based incidents where the defendant was able to cope. The mental health experts clearly related Coday's inability to conform his conduct to situations that occur when he is, or feels that he is, being rejected in relationships involving women.
The expert testimony from the defense could be rejected only if it did not square with other evidence in the case. While we have given trial judges broad discretion in considering unrebutted expert testimony, we have always required that rejection to have a rational basis. For example, the expert testimony could be rejected because of conflict with other evidence, credibility or impeachment of the witness, or other reasons. However, none of those reasons are present here. Instead, the State relies on evidence we find not in conflict with the defense evidence. Under these circumstances, the mitigating factor of inability to conform his conduct to the requirements of the law was reasonably established by the greater weight of the evidence and should have been considered by the trial judge as having been established.
Because we conclude the trial court erred in finding that this mitigating circumstance had not been established, we vacate the death penalty imposed in this case and remand to the trial judge for reevaluation of the mitigation and the sentence.[5]

Constitutionality of Florida's Death Penalty Statute/Ring[6] Claims
Coday claims Florida's death penalty statute is unconstitutional because Florida law requires findings of fact (in particular, aggravating circumstances) be made by the trial judge and not the jury. Therefore, he alleges his sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). As this Court explained in State v. Steele, 921 So.2d 538 (Fla.2005), the Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona do not require a finding that the Florida capital sentencing scheme is unconstitutional. In Steele, we not only concluded, consistent with prior caselaw, that section 921.141, Florida Statutes, does not require jury findings on aggravating circumstances, we specifically held that it is a departure from the essential requirements of law to use a special verdict form detailing the jury's determination on the aggravating circumstances. Thus, we have rejected Coday's argument that the *1006 Apprendi and Ring decisions require a different result.
Coday also claims that because the jury's death sentence recommendation was not unanimous but only by a vote of nine to three, his sentence is unconstitutional under Ring. However, under Florida law, the jury need not be unanimous in its recommendation of a death sentence. This Court has repeatedly held that it is not unconstitutional for a jury to be allowed to recommend death on a simple majority vote. See Whitfield v. State, 706 So.2d 1 (Fla.1997); Thompson v. State, 648 So.2d 692 (Fla.1994); Brown v. State, 565 So.2d 304 (Fla.1990); Alvord v. State, 322 So.2d 533 (Fla.1975). This Court has not receded from this holding that a nonunanimous advisory sentence is constitutional.
Lastly, Coday claims that the failure to allege the aggravating circumstances in the indictment renders his sentence unconstitutional under Ring. This Court has rejected similar claims that Ring requires aggravating circumstances be alleged in the indictment. See Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003) (rejecting Blackwelder's argument that aggravating circumstances should be alleged in the indictment, submitted to the jury, and individually found by a unanimous jury verdict); Hodges v. State, 885 So.2d 338, 359 (Fla.2004); Porter v. Crosby, 840 So.2d 981 (Fla.2003).[7]

Finding of Heinous, Atrocious, or Cruel (HAC)
Coday asserts that he did not have an intentional design to torture or inflict pain. Therefore, he states that the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance in this case. "In order for HAC to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim." Anderson v. State, 841 So.2d 390, 406 (Fla.2003). In this case, Coday brutally beat Gloria Gomez with two hammers a total of fifty-seven times. He then stabbed her eighty-seven times. The medical examiner testified that Gomez was alive for 143 of the 144 wounds, that she was conscious for all of her defensive wounds, and that she may have been conscious for 143 of the wounds. In Coday's signed, written confession, he wrote that Gomez was alive until the fatal stab wound when he thrust the knife into her neck and held it there until she expired. The facts demonstrate at the very least an utter indifference to the suffering of Gloria Gomez. The trial court did not err in finding the HAC aggravating circumstance in this case.

Cross-Examination on Incident in Germany
The trial court permitted the State to cross-examine Coday's expert witnesses during the penalty phase on any information which formed the basis for their opinions including a prior murder[8] *1007 committed by Coday. This ruling conforms with our decision in Valle v. State, 581 So.2d 40 (Fla.1991). In Valle, we said that section 921.141(1), Florida Statutes, allows for broader admissibility of evidence during the penalty phase of a trial. Id. at 46. We found that it was proper for the State to cross-examine the defense's expert witnesses about incidents in prison for which the defendant had not been convicted so long as those incidents were used by the experts in formulating their opinions. Id. Similarly, in Parker v. State, 476 So.2d 134 (Fla.1985), we said:
In the instant case, the testimony of the defense expert that he based his opinion regarding appellant's non-violent nature on the appellant's past personal and social developmental history, including a prior criminal history, opened the door for this cross-examination by the state. We find that it is proper for a party to fully inquire into the history utilized by the expert to determine whether the expert's opinion has a proper basis.
Id. at 139. Accordingly, we find that the trial court's ruling here was proper.

Request for Juror Interviews
During the penalty phase, Coday moved to interview the jurors regarding their exposure to media reports. The trial court denied Coday's motion, and Coday asserts that this was error because there were a number of media reports about the case after the guilt phase and a number of jurors were excused due to exposure to media reports. We have said that "juror interviews are not permissible unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings." Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001). "This standard was formulated `in light of the strong public policy against allowing litigants either to harass jurors or to upset a verdict by attempting to ascertain some improper motive underlying it.'" Id. (quoting Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97, 100 (Fla.1991)).
On numerous occasions throughout the penalty phase, the trial court inquired of the jurors, both individually and as a group, whether they had been exposed to outside sources, particularly the media. As a result of this repeated inquiry, the trial court excused three jurors due to their exposure to outside sources. The remainder of the jurors indicated that they had not been exposed to outside influences, and Coday did not provide any information to contradict their assertions. Hence, we find that the trial court properly denied Coday's motion to interview the jury.

Jury Instructions/Penalty Phase
Lastly, Coday asserts the trial court erred by instructing the jury that it was giving an advisory sentence in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Coday also asserts that the trial court erred in its instruction to the jury concerning the effect of undecided votes. These claims have no merit.
First, the Caldwell issue was not preserved because Coday did not object to the instructions that were given to the jury *1008 prior to their deliberations. See Mordenti v. State, 630 So.2d 1080 (Fla.1994) (stating that absent fundamental error, claims not raised at trial are procedurally barred). Second, the trial court gave the standard jury instruction. "This Court has repeatedly held that the Florida Standard Jury Instructions are in compliance with Caldwell." Globe v. State, 877 So.2d 663, 674 (Fla.2004); accord Thomas v. State, 838 So.2d 535, 542 (Fla.2003) (reiterating that the Florida Standard Jury Instructions have been determined to be in compliance with the requirements of Caldwell).
The jury submitted the following question to the trial court which the trial court read aloud to both the State and the defense: "Does every juror have to have a recorded vote in favor of death or life, as opposed to one or two people voting undecided?" The trial court instructed the State and the defense to think about that question overnight and to present all available case law and arguments on the issue the following morning. The next morning, both the State and the defense conceded that they could not find any case law on the consequence of an undecided vote. The only case that they could find that was moderately close was Phillips v. State, 705 So.2d 1320 (Fla.1997). In Phillips, the jury informed the trial court that two of the jurors were refusing to vote because they did not like the way the majority was leaning. The trial court then instructed the jury to have the remaining ten jurors vote and to have that vote recorded and that any refusal to vote would be considered a vote for life. Id. When the jury returned with its verdict, all twelve members had voted, so the point was moot. Id.
In the instant case, the defense argued that the media and outside influences were pressuring the jury to vote for death and requested that the trial court question each of the jurors again regarding whether they felt pressured by outside influences. As previously discussed, the trial court thoroughly addressed this issue. The trial court then brought out the jury and attempted to resolve the problem by instructing them in accordance with Florida Standard Jury Instruction (Criminal) 7.11.
THE COURT: The advisory verdict need not be unanimous. The recommendation for imposition of the death penalty must be by a majority of the jury. A recommendation of incarceration for life without the possibility of parole may be made either by a majority of you, or an even division of the jury, that is even, a tie vote of 6 to 6 is a life recommendation.
So, what I have explained to you, I think, answers your question from yesterday.
At this time you can retire to the jury room. I see some heads, perhaps, nodding.
If you have any additional questions, as I said before, put them in writing.
At this time you may retire to the jury room and continue with your deliberations.
After returning to the jury room, the jury sent out the following note, "Does an undecided vote count as life?" Once again, the defense stated that the jurors were afraid to attach their name to a life recommendation because of the media publicity. The State argued that an undecided vote could not constitute a vote for either life or death but rather was a nullity. The defense then recommended that the trial court submit a new verdict form to the jury with an additional blank space reading "undecided." The State countered by proposing that the trial court instruct the jury that seven or more votes in favor of the death penalty would be deemed as an advisory verdict for the trial court to impose *1009 the death penalty and that anything short of seven votes in favor of death would be deemed a life verdict. The trial court did not favor either proposal but decided to provide them with the following instruction.
THE COURT: Welcome back, ladies and gentlemen.
I received your most recent question. I have had an opportunity at some length to review it with the attorneys.
Ladies and gentlemen, whether an undecided vote is deemed a life vote, that is a legal matter for me to decide, and you should not concern yourself with that. It's simply a question and a legal matter for me to decide and you should not concern yourself with that. I encourage you to vote. I cannot force you to vote. I will not force you to vote.
Your verdict forms should reflect the votes of those of you that you feel that you can vote. Nobody is being forced to vote. We encourage you to vote. Again, the verdict form will reflect the vote of those of you that feel you are capable and in a position to vote. But what the affect of a non vote is, that's a legal matter for me to be concerned with.
Don't concern yourself with that. Okay?
You may now retire back to the jury room.
Five minutes after the jury resumed deliberations, they arrived at their verdict, a nine-to-three death recommendation. All jurors were polled, and each juror confirmed that the advisory verdict accurately reflected the vote of those jurors voting. Clearly, the trial court did not err in providing this instruction which expressly declared that while they were encouraged to vote, they were not forced to vote. It was entirely within the trial court's discretion to deny the defense's requested verdict form which allowed for undecided votes; judges in Florida are not required to use special verdict forms. See Turner v. Dugger, 614 So.2d 1075, 1081 (Fla.1992).

CONCLUSION
Based on the foregoing, we affirm William Coday's conviction for first-degree murder. We vacate the death sentence and remand this case to the trial court to reevaluate the sentence.
It is so ordered.
LEWIS, C.J., and QUINCE and BELL, JJ., concur.
QUINCE, J., specially concurs with an opinion.
BELL, J., concurs with an opinion.
ANSTEAD and PARIENTE, JJ., concur in part and dissent in part with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion.
CANTERO, J., concurs in part and dissents in part with an opinion, in which WELLS, J., concurs.
QUINCE, J., specially concurring.
I concur in the majority's decision to affirm the first-degree murder conviction, and in the majority's decision to vacate the sentence of death and remand to the trial court to reevaluate the mitigating evidence presented. I write to explain that this reevaluation is dictated by the evolution of the death penalty jurisprudence in this State and on the federal levelan evolution that has been thirty-four years in the making. This evolution of the law has required the trial courts, trial counsel, and reviewing courts to give more focused attention to the defendant and to the individual *1010 circumstances that have brought the defendant before the court system. If we allow a trial judge to ignore the kind of mitigating evidence presented in this case, then we are only giving lip service to the concepts that are embodied in the case law that has emerged from this Court since the reinstitution of the death penalty in this State.
In 1972 the United States Supreme Court invalidated the death penalty in a number of states with its landmark decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972),[9] and other cases.[10] The reversal of the death penalties in the Furman cases was due in large part to the fact that judges and juries were free to impose the death sentence without any governing standards, that is, the selection of the defendants to receive a death sentence was totally arbitrary and capricious. See Furman v. Georgia, 408 U.S. at 295, 92 S.Ct. 2726 (Brennan, J., concurring). In his concurring opinion in Furman, Justice Stewart described the constitutional infirmities of the death penalty as follows:
These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. See McLaughlin v. Florida, 379 U.S. 184[, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) ]. But racial discrimination has not been proved, and I put it to one side. I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.
Id. at 309-10, 92 S.Ct. 2726 (Stewart, J., concurring) (footnotes omitted). While there was no majority opinion in Furman, it seems clear to me that the five justices[11] who concurred in the judgment were deeply concerned about the capriciousness of the imposition of this unique and ultimate penalty.
In this vein, Justice White, in concluding that the death penalty in the cases before the Supreme Court violated the Eighth Amendment, opined, "[T]he death penalty is exacted with great infrequency even for *1011 the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." Id. at 313, 92 S.Ct. 2726 (White, J., concurring). Even Justice Marshall, who argued that death is always a cruel and unusual punishment, also concluded that the death penalty is arbitrarily imposed against identifiable classes of people (Blacks), the poor, the ignorant, and underprivileged members of our society. He said, "It is the poor, and the members of minority groups who are least able to voice their complaints against capital punishment. Their impotence leaves them victims of a sanction that the wealthier, better-represented, just-as-guilty person can escape." Id. at 366, 92 S.Ct. 2726 (Marshall, J., concurring).
After Furman, the Georgia Legislature amended the Georgia statutory scheme to provide for a bifurcated[12] capital sentencing procedure wherein the defendant's guilt or innocence is determined in the first phase. See 1973 Ga. Laws p. 159. (now codified as Ga.Code Ann. §§ 17-1030,-31,-32,-33,-35,-37 (2004 & Supp. 2006)). If guilt is established in this first phase, either the judge or the jury must determine in a second phase the applicable aggravating and mitigating circumstances in order to determine the appropriate penalty, which could include death. Id. § 3.1 (now codified as Ga.Code Ann. § 17-10-30 (Supp.2006)).[13] In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court was asked to determine if this revised statute still violated the Eighth and Fourteenth Amendments. Seven members of the Court concurred in the judgment which affirmed the decision of the Georgia Supreme Court approving the judgment and sentence of the death under the revised statute. Six of the justices, albeit in two separate opinions, found Georgia's bifurcated scheme satisfied the deficiencies found in Furman because the statute not only guided the discretion of the judge and jury in the imposition of a death sentence but also gave the state supreme court the power to review the cases in light of other cases to determine whether the death penalty in a particular case is disproportionate or is otherwise being imposed arbitrarily.
The Florida Legislature also revised the Florida death penalty statute and instituted a bifurcated procedure in this State. See ch. 72-724, § 9, Laws of Fla. (now codified as § 921.141, Fla. Stat. (2005)).[14] Our new statutory scheme provided for a separate proceeding to determine the appropriate sentence once the defendant had *1012 been found guilty of a capital offense.[15] Similar to the Georgia scheme, the revised Florida statute provides for aggravating and mitigating circumstances that may be presented to the judge or jury in support of a sentence of life or death. In four consolidated cases, commonly referred to as State v. Dixon, 283 So.2d 1 (Fla.1973),[16] the validity of the revised statute was considered by this Court. In finding Florida's revised statute was not unconstitutional, this Court's majority (by a vote of 5-2) outlined the five steps that must be followed before an effective death sentence can be imposed. Id. at 7-8. The first, and vitally important, step in this process is that in the penalty phase, which is separate from the guilt phase, "the trial judge and jury can hear other information regarding the defendant and the crime." Id. at 7. The presentation of this additional evidence is designed to ensure that a sentence of death is not capricious and discriminatory and that the death penalty is reserved for "only the most aggravated and unmitigated of most serious crimes." Id.
In several cases that followed Dixon, this Court affirmed death sentences without any meaningful discussion of the aggravating and mitigating circumstances. See, e.g., Hallman v. State, 305 So.2d 180 (Fla.1974) (affirming a sentence of death despite a concurring opinion indicating there were other mitigating factors that should have been weighed by the court); Gardner v. State, 313 So.2d 675 (Fla.1975) (affirming a death sentence imposed after a jury recommendation of life even though the dissenting opinion outlined mitigating evidence that should have been found), vacated, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977);[17]Spinkellink v. State, 313 So.2d 666 (Fla.1975) (affirming a sentence of death where there was no consideration given to mitigating evidence concerning the actions of the victim); Sawyer v. State, 313 So.2d 680 (Fla.1975) (affirming a sentence of death imposed after the jury recommended life even though the trial judge's decision was based in part on what appears to be nonstatutory aggravation).
Several months after the decision in Sawyer, we decided Tedder v. State, 322 So.2d 908 (Fla.1975), in which we were asked to determine whether the defendant's sentence of death was appropriate in light of the jury's recommendation of life. We remanded the case to the trial court to enter a sentence of life imprisonment and said, "In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." Id. at 910. Less than a year later in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 *1013 (1976),[18] the Supreme Court upheld Florida's death penalty statute against constitutional challenges and found that the revised statute addressed the constitutional deficiencies identified in Furman.
As more sentences of death were imposed, this Court and the United States Supreme Court sought to give meaning to the judge and jury's consideration of the aggravating and mitigating evidence. These refinements to the treatment and consideration of mitigating circumstances were addressed in decisions on direct appeal and in decisions involving postconviction motions to vacate the judgment and sentence. In Magill v. State, 386 So.2d 1188, 1191 (Fla.1980), we remanded the case for a new review by the trial judge because the judge failed to make any findings concerning the mitigating evidence considered. As we explained, the trial judge is required to articulate the mitigating circumstances that the judge considered in imposing sentence. Id. In Holmes v. State, 429 So.2d 297 (Fla.1983), this Court vacated a sentence of death and remanded for a new sentencing hearing, finding ineffective assistance of counsel at the penalty phase, based on counsel's failure to present available mitigating evidence to the jury. We noted counsel's shortcomings as follows:
Instead of arguing that the crime was not heinous, atrocious, or cruel, defense counsel conceded the existence of this questionable aggravating circumstance. Furthermore he made no reference to the reports of the two court-appointed psychiatrists who suggested that Holmes may have been in some kind of disturbed psychological state at the time of the murder. Although these reports were delivered after the sentencing hearing was held, counsel made no attempt to reopen the proceeding for the purpose of presenting the reports or testimony of the psychiatrists. As a result, the court imposed sentence without the benefit of available expert opinion pertaining to Holmes's mental and emotional condition. A psychological disturbance at the time of a capital felony may be relevant in mitigation even though it is not sufficient ground for invoking the insanity defense. State v. Dixon, 283 So.2d 1 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Defense counsel also avowed that it did not occur to him to request a presentence investigation even though appellant's lack of a criminal record would have rendered the report, at least in part, a favorable one for mitigation.
Id. at 300.
Subsequently, the United States Supreme Court in a case from Florida held that a sentencer could not refuse to consider or be precluded from considering any relevant mitigating evidence. See Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). This case arose in the context of the jury being instructed that its consideration of mitigation was limited to the mitigating factors enumerated in Florida's death penalty statute. Id. at 398, 107 S.Ct. 1821. The jury had been presented evidence of the defendant's poor family background, of his habit of sniffing gasoline as a child, as well as other evidence that did not fit into any statutory mitigating category. The Supreme Court cited its earlier decisions of Skipper v. South Carolina,[19]Eddings v. *1014 Oklahoma,[20] and Lockett v. Ohio,[21] and concluded that precluding a jury from considering such nonstatutory evidence was error. When considered together, Skipper, Eddings, and Lockett make it clear that a defendant in a capital sentencing proceeding has a constitutional right to an individualized sentencing hearing where he can introduce, and the sentencer must consider, any relevant evidence which is offered in mitigation of his sentence. The relevant evidence can relate to the defendant's character and record and to the circumstances of the crime itself. See Rogers v. State, 511 So.2d 526 (Fla.1987); Hall v. State, 541 So.2d 1125 (Fla.1989). Thus, the Supreme Court remanded the Hitchcock case for entry of an order requiring either a new sentencing hearing or imposition of a sentence less than death. See Hitchcock, 481 U.S. at 399, 107 S.Ct. 1821; see also White v. State, 729 So.2d 909 (Fla.1999) (remanding for a new sentencing proceeding based on Hitchcock error).
Several years later in Campbell v. State, 571 So.2d 415 (Fla.1990), receded from in part by Trease v. State, 768 So.2d 1050 (Fla.2000), this Court addressed the issue of the trial court's duty to consider and weight the mitigating evidence that is presented by the defendant. After acknowledging controlling case law from the Supreme Court which requires the sentencer to consider the mitigating evidence offered by the defendant and after stating that the sentencer may not give a mitigating factor no weight by excluding it from consideration, we outlined some guiding principles to be applied by the trial courts in evaluating the mitigating evidence presented. We explained:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. See Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence: "A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established." Fla. Std. Jury Instr. (Crim.) at 81. The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance. Although the relative weight given each mitigating factor is within the province of the sentencing court, a mitigating factor once found cannot be dismissed as having no weight. To be sustained, the trial court's final decision in the weighing process must be supported by "sufficient competent evidence in the record." *1015 Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981).
Campbell, 571 So.2d at 419-20 (footnotes omitted); accord Merck v. State, 763 So.2d 295 (Fla.2000) (remanding for a new penalty phase where the trial court failed to find, evaluate, and weigh nonstatutory mitigating evidence in the sentencing order and where this Court invalidated one aggravating factor).
As has often been said, the death penalty is a unique punishment that requires that it be administered proportionately. See, e.g., Urbin v. State, 714 So.2d 411, 416 (Fla.1998); Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Because of this uniqueness and the finality of the punishment, and even after the guidelines set out in Campbell, trial courts have continued to struggle with their evaluation of this important factor in any death penalty analysis mitigating circumstances. In particular, courts were wrestling with what if any weight had to be given to mitigating circumstances once they were found to have been established. Therefore, in Trease v. State, 768 So.2d 1050 (Fla.2000), we made the following refinement:
We therefore recognize that while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case. For example, while being a drug addict may be considered a mitigating circumstance, see Mahn v. State, 714 So.2d 391, 401 (Fla.1998), that the defendant was a drug addict twenty years before the crime for which he or she was convicted may be sufficient reason to entitle the factor to no weight.
Trease, 768 So.2d at 1055. Notably, Trease only permits the sentencer to give no weight to a mitigating factor based on the unique circumstances presented in a specific case.
As the majority indicates, a mitigating circumstance can only be rejected if it is not proven or if it cannot be reconciled with the other evidence in the case. Majority op. at 1005. In other words, if the mitigating evidence offered by the defendant is in fact mitigating in nature and is connected to the facts and circumstances of the instant crime, the trial judge may not give that mitigating evidence no weight. In light of the standards enunciated in these cases, we have reversed cases where the trial judge has failed to properly find, consider, and evaluate all of the mitigating evidence presented by the defendant. See, e.g., Harris v. State, 843 So.2d 856, 868-70 (Fla.2003) (vacating the death sentence and remanding for a new penalty phase where the trial court failed to consider all of the evidence offered by defendant in support of the mitigating factor of extreme mental or emotional disturbance and the trial court and the jury improperly considered the pecuniary gain aggravating factor); Crook v. State, 813 So.2d 68, 74-78 (Fla.2002) (vacating the death sentence and remanding for reconsideration by the trial judge because the trial judge erred in rejecting uncontroverted evidence of brain damage and borderline mental retardation); Merck v. State, 763 So.2d 295, 297-99 (Fla.2000) (vacating the death sentence and remanding for a new penalty phase proceeding based on the trial judge's failure to find, evaluate, and weigh nonstatutory mitigating evidence of alcohol abuse in the sentencing order).
Trial counsel's obligation to zealously advocate for their clients is just as important in the penalty phase of a capital proceeding *1016 as it is in the guilt phase. There is no more serious consideration in the sentencing arena than the decision concerning whether a person will live or die. When an attorney takes on the task of defending a person charged with a capital offense, the attorney must be committed to dedicate both time and resources to thoroughly investigate the background and history, including family, school, health, and criminal history, of the defendant for the kind of information that could justify a sentence of less than death. I believe that the constitution and the case law from both this Court and the United States Supreme Court require no less.
Thus, in addition to the line of cases that require the courts to permit defendants to present all relevant mitigating evidence and that require the sentencer to consider all relevant mitigating evidence presented, we have evaluated cases involving claims that the relevant mitigating evidence was not presented to the sentencer because of error made by trial counsel. For example, in Hildwin v. Dugger, 654 So.2d 107 (Fla. 1995), Hildwin argued in a postconviction proceeding that his trial counsel was ineffective for failing to investigate and present relevant mental health mitigating evidence. At the postconviction evidentiary hearing, Hildwin presented evidence from two mental health experts who opined that the two statutory mental health mitigators were applicable to his case. Id. at 110. Evidence was also presented concerning Hildwin's abused and neglected childhood, his history of substance abuse, and signs of organic brain damage. Id. This Court found that both prongs of the standard enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that is, deficient performance and resulting prejudice, were demonstrated. Hildwin, 654 So.2d at 109, 110.
We again discussed the importance of counsel's preparation for the penalty phase in Rose v. State, 675 So.2d 567 (Fla.1996). At resentencing, Rose was represented by an attorney who was not familiar with capital case sentencing. The attorney did not investigate Rose's background or obtain the kinds of records (school, hospital, prison, etc.) that often lead to mitigating evidence. Instead, counsel relied on the advice of another attorney who urged him to present an accidental death theory at the penalty phase. At the rule 3.850 evidentiary hearing, Rose presented evidence that he grew up in poverty, that he was emotionally abused and neglected, that he was a slow learner and was retained in several grades, that he was a chronic alcoholic, that he had been previously described as schizoid, that he suffered from organic brain damage, and that he met the criteria for the statutory mental health mitigators. After finding counsel's performance was deficient, we addressed the prejudice prong of Strickland and said:
In evaluating the harmfulness of resentencing counsel's performance, we have consistently recognized that severe mental disturbance is a mitigating factor of the most weighty order, Hildwin, 654 So.2d at 110; Santos v. State, 629 So.2d 838, 840 (Fla.1994), and the failure to present it in the penalty phase may constitute prejudicial ineffectiveness. . . . Indeed, the substantial mitigation that has been demonstrated on this record is similar to the mitigation found in Hildwin and Baxter[[22]] to require a resentencing proceeding where such evidence *1017 may be properly presented. Phillips v. State, 608 So.2d 778, 783 (Fla.1992) (prejudice established by "strong mental mitigation" which was "essentially unrebutted"), cert. denied, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993); Mitchell v. State, 595 So.2d 938, 942 (Fla.1992) (prejudice established by expert testimony identifying statutory and nonstatutory mitigation and evidence of brain damage, drug and alcohol abuse, and child abuse); State v. Lara, 581 So.2d 1288, 1289 (Fla.1991) (prejudice established by evidence of statutory mitigating factors and abusive childhood).
Rose, 675 So.2d at 573.
In recent years, the United States Supreme Court has also addressed the duty of counsel regarding the investigation and presentation of mitigating evidence. While adhering to the two-pronged analysis articulated in Strickland v. Washington for ineffective assistance of counsel claims, the Supreme Court reiterated the standard for determining whether or not an attorney's decision to forego available mitigating evidence could be considered strategic or tactical. See Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In Wiggins, the Supreme Court held, consistent with its earlier decisions, that an attorney's decision to forego the presentation of mitigating evidence can only be a strategic or tactical decision if the decision is made after a reasonable investigation or after making a reasonable decision that would make investigation unnecessary. Id. at 521, 123 S.Ct. 2527; accord Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding counsel's failure to discover available mitigation was not a tactical decision because counsel had not conducted a thorough investigation of the defendant's background). More recently, in Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the Supreme Court stated that even in cases where there is no mitigating evidence available, counsel has a duty to investigate and prepare to meet the aggravating factors that the State will present. In Rompilla, the Supreme Court concluded that counsel was ineffective because counsel failed to examine the files concerning the defendant's prior rape and assault convictions until the day before the sentencing hearing, even though counsel was aware that the State intended to prove that Rompilla had a significant criminal history.[23]
Since Wiggins and Rompilla, this Court has found counsel ineffective in the investigation and presentation of mitigating evidence in a number of cases. In Orme v. State, 896 So.2d 725 (Fla.2005),[24] we found *1018 counsel ineffective for failing to further investigate a defendant's diagnosis of bipolar disorder and to present that evidence to the jury. Even though counsel was aware of the bipolar diagnosis and was aware that the defendant was on medication for the condition, counsel conducted no further investigation, did not talk with family or friends about the defendant's condition, and had no explanation for his failure to act on the information. Similarly, in State v. Duncan, 894 So.2d 817 (Fla. 2004), a single aggravator case, we found counsel ineffective for failing to present available mental health mitigation evidence from an expert who had been hired by trial counsel.
This evolution of the death penalty jurisprudence leads me to the inescapable conclusion that we cannot allow trial courts to simply ignore relevant mitigating evidence that is supported by competent, substantial evidence. To do so would take us back in time to the situation where a sentencer had total discretion to simply ignore mitigating circumstances, wantonly and indiscriminately accepting evidence in some cases and setting it aside in others. To do so would take us back to the situation that the Supreme Court found violated the Eighth and Fourteenth Amendments in Furman. Justice Cantero opines that the majority's opinion would allow any testimony, "no matter how ludicrous, improbable, or divorced from reality." However, this slippery slope argument ignores undisturbed precedent that mitigating evidence must be supported by competent, substantial evidence that can be reconciled with other evidence in the case. This is the type of evidence that trial courts do not have the discretion to ignore. The Court's holding today breaks no new ground. It simply confirms years of precedent and refinement, directing the discretion of trial courts in the imposition of this unique penalty.
In the case that is presently before this Court, we have the type of evidence that "has the potential to totally change the evidentiary picture." Baxter v. Thomas, 45 F.3d at 1515 (quoting Middleton v. Dugger, 849 F.2d 491, 495 (11th Cir.1988)). Furthermore, the experts specifically tied Coday's mental health evidence to the factual scenario of this case. Thus, unlike some death penalty cases we have reviewed, the mental health evidence here was not presented in a vacuum or as a static condition. The experts explained how the domestic situation that Coday faced triggered his psychosis. This expert testimony was not rebutted and was not antithetical to the other evidence in the case.
Thus, I fully concur in the majority's determination that the trial court erred in failing to find that Coday had established the mitigating circumstance of lack of ability to conform his conduct to the requirements of the law at the time of the homicide.
BELL, J., concurring.
I agree with the majority that the trial court erred in failing to find that Coday's capacity to conform his conduct to the requirements of the law was substantially impaired as a statutory mitigating circumstance. See § 921.141(6)(f), Fla. Stat. (2002). I write separately to elaborate upon why this result is dictated by the record before us. First, I discuss the deficiency in the trial judge's written order. Next, I discuss how the six mental health experts uniformly testified that this mitigating factor was present and that their findings went largely unimpeached and uncontroverted by any other competent evidence. Finally, like the majority, I conclude that given the quantum of the uncontroverted expert testimony in support *1019 of this mitigating circumstance, the trial judge abused his discretion in rejecting it.
Section 921.141(3), Florida Statutes (2002), mandates that a trial court must support the imposition of a death sentence with "specific written findings of fact based upon the circumstances of subsections (5) and (6) and upon the records of the trial and the sentencing proceedings." As this Court has said, "[w]henever a reasonable quantum of competent uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved." Morton v. State, 789 So.2d 324, 330 (Fla. 2001) (emphasis added) (quoting Mahn v. State, 714 So.2d 391, 400-01 (Fla.1998)). Alternatively stated, though "[a] trial court may reject a defendant's claim that a mitigating circumstance has been proved," the trial court's rejection of these mitigating circumstances must be supported by competent, substantial evidence. Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990).
The trial judge's sentencing order rejecting the mitigating circumstance in subsection (6)(f) does not satisfy these requirements. Six mental health experts[25] testified that Coday's capacity to conform his conduct to the requirements of the law was substantially impaired. In his sentencing order, the trial judge points to no evidence contradicting these six opinions. Instead, he simply writes:
The testimony of the mental health experts does not convince the Court that the Defendant is relieved of accountability for his conduct, or otherwise, was not aware of the consequences of his actions upon Gloria Gomez. The Defendant had the capacity to appreciate the criminality of his conduct. Moreover, since the Defendant's return from Germany, until this tragic crime, he conducted himself without incident. The fact that he could conform his conduct for so many years shows that he had the capacity to abide by the law. This statutory mitigating circumstance has not been established and the Court assigns it no weight.
Again, this finding fails to point to any evidence from the trial or sentencing proceeding that actually controverts the unanimous opinion of these six mental health experts that this mitigating circumstance existed. Having reviewed the record, I conclude that this deficiency necessarily flows from the fact that there is no competent, substantial evidence that contradicts these expert assessments.
The record clearly shows that Coday was entitled to have this mitigating factor considered. The six mental health experts testified to its presence. Their testimony in this regard was remarkably consistent. Not only did each of them diagnose Coday with severe depression with psychotic features, each one also testified that his psychotic breaks were triggered when he felt rejected in romantic relationships.
The only portion of any of these experts' testimony remotely suggesting that Coday had the capacity to properly conform his behavior under the circumstances was given by Dr. Walker. However, when considered in context, this evidence supports Coday's contention that this mitigator was established. In discussing how Coday felt when he thought he was being rejected, Dr. Walker stated:

*1020 He describes feeling [laughed at and humiliated] at several other times when other women that he had relationships with, had rejected him, and he felt rejected, but was able to contain himself, and exactly why he could contain himself at other times, and not at this time, I think was in the relationship and in the actual dynamics of the relationship, rather than in his mental illness and an ability to deal with the dynamics of that relationship.
However, Dr. Walker then elaborated by describing the similarities between Coday's relationship with Ms. Hullinger and his relationship with Ms. Gomez. In particular, she described the continuous back-and-forth, on-again, off-again pattern with no clean break in the relationshipa pattern Dr. Walker said was not present in Coday's relationships with other women.
The testimony of these six mental health experts clearly satisfied the "reasonable quantum" of competent evidence required to establish this mental health mitigating factor. See Morton, 789 So.2d at 330. The experts were very specific in their assessmentsCoday only has psychotic breaks when he feels rejected in his romantic relationships. Indeed, the record reflects only three incidents of romantic rejection and each was followed by a psychotic episode: (1) Lisa Hullinger rejected Coday, resulting in her brutal murder; (2) Gloria Gomez rejected Coday and told him she was going to marry someone else, resulting in her brutal murder; and (3) Coday's wife, Tooska, served divorce papers on him, resulting in Coday's attempted suicide. Although Coday was married twice and divorced once between the two murders and carried on at least one other romantic relationship, there is no evidence in the record that any of these break-ups were similar rejections of Coday by the woman involved. In fact, the record reflects that he remained friends with both of his ex-wives, and both testified on his behalf in the penalty phase of the trial. Therefore, the experts' testimony provides a "reasonable quantum" of competent evidence of mitigation and, absent adequate contradiction of this testimony, the trial court should have found the mitigating circumstance to be proven. See id.
There is no such adequate, contradictory evidence. There is no expert testimony or other record evidence that controverts the opinions of these six experts. Admittedly, "[e]ven uncontroverted opinion testimony can be rejected, especially when it is hard to reconcile with the other evidence presented in the case. As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion." Foster v. State, 679 So.2d 747, 755 (Fla.1996) (citation omitted). However, this is not such a case. This is not a case in which the uncontroverted expert opinion testimony is hard to reconcile with the other evidence presented. Significantly, the State did not successfully impeach the credibility of the defense experts; and, remarkably, it offered no mental health expert of its own in response. Moreover, the State never questioned any of the three women with whom Coday had romantic relationships about the nature of the relationship or how Coday reacted when the relationship ended.
Not only did the State fail to directly or indirectly contradict the expert testimony, the other evidence in the case is not inconsistent with the expert opinions.[26] For *1021 example, the record includes evidence of one additional psychotic episode while Coday was in law school and two additional incidents of violence against women.[27] Moreover, the lay witnesses could only testify that Coday behaved normally in his day-to-day interactions. This evidence easily reconciles with the expert opinion testimony; in fact, it confirms the expert testimony.
Given that there was much more than a reasonable quantum of competent evidence that Coday's capacity to conform his behavior to the requirements of the law was substantially impaired and that this evidence was uncontroverted, the trial judge abused his discretion in finding that this mitigating circumstance was not established. Accordingly, I concur with the majority.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for its discussion of the United States Supreme Court decisions in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
I also fully concur in the thorough review of the state of the law on the proper consideration and evaluation of mitigation evidence in death penalty cases set out in Justice Quince's concurring opinion. Ultimately, of course, Florida courts, like all other state courts, are governed by the decisions of the United States Supreme Court. That Court has held, for example, that mitigating circumstances may consist of any fact or reason advanced in support of a claim for mercy in sparing the life of the defendant. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In addition, the United States Supreme Court has declared:
Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. . . . The sentencer, and the [appellate court], may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.
Eddings v. Oklahoma, 455 U.S. 104, 114-15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
PARIENTE, J., concurring in part and dissenting in part.
With one exception, I concur in the majority opinion, including its reversal of the *1022 death sentence because the trial court erred in rejecting as statutory mitigation substantial impairment of Coday's capacity to conform his conduct to the requirements of law. I further agree with the historical explanation by Justice Quince in her concurrence as to why giving that mitigator no weight is contrary to the role played by mitigating factors in ensuring that Florida's capital sentencing scheme complies with the Eighth Amendment. I write separately to state my respectful disagreement with the Court's resolution of Coday's claim under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and to expand briefly on the Court's recommendation of capital sentencing reform in State v. Steele, 921 So.2d 538 (Fla.2005).

I. Constitutional Validity of Coday's Sentence
I believe that Florida's capital sentencing scheme, as applied in this case, violates the right to jury trial under article I, section 22 of the Florida Constitution. It remains my view, first stated three years ago, that Ring requires that any fact, other than a separate conviction, that qualifies a capital defendant for a sentence of death must be found by a jury; and that our state constitutional guarantee of trial by jury requires that this finding be unanimous. See Butler v. State, 842 So.2d 817, 835-40 (Fla.2003) (Pariente, J., concurring in part and dissenting in part). The jury's nine-to-three death recommendation in this case falls short of a unanimous finding of a death-qualifying aggravating circumstance, which would satisfy article I, section 22. Further, the single aggravating factor, that the killing was especially heinous, atrocious, or cruel (HAC), does not rest on the fact of a prior conviction based on a unanimous jury verdict or guilty plea waiving the right to a jury trial.
I recognize that this Court has consistently rejected Ring claims in both direct appeals and postconviction proceedings. In postconviction cases, we have held that Ring is not retroactive to Florida death sentences that were final on direct appeal when Ring was decided. See Johnson v. State, 904 So.2d 400 (Fla.2005). I concurred in that decision. In direct appeals as well as postconviction cases predating Johnson, the Court has pointed to unanimous jury recommendations or aggravating factors resting on convictions of other crimes in denying Ring claims.[28] I have agreed with these grounds for denying Ring claims as well.
The principles in Ring are applicable, however, in the rare direct appeal in which there is neither a valid separate-conviction aggravator nor a jury verdict reflecting a unanimous finding of a death-qualifying aggravator. Butler was one such case; this is another. In rejecting the Ring claim in Butler, the majority simply cited to its decisions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002). See 842 So.2d at 837. Bottoson and King are inapplicable to a case in this posture for several reasons: *1023 neither decision garnered a majority opinion, both cases involved death sentences that were final, the aggravators in both cases included previous conviction of a violent felony, and King's jury unanimously recommended death.
Today the majority relies on its decision in Steele, a case that reached us in a pretrial posture and consequently did not involve a constitutional challenge to a sentence of death. A majority of this Court has yet to conclude that a death sentence unsupported by a separate-conviction aggravator exempt from Ring or a unanimous penalty-phase finding of an aggravatorimplicitly in a death recommendation or explicitly in a special verdictviolates neither the state nor federal constitutional right to trial by jury. And so I continue to dissent when these circumstances exist.
In the absence of either an "other-conviction" aggravator or a unanimous jury finding that one or more aggravators exist, it remains my view that a sentence of death violates both the Sixth Amendment and article I, section 22 of the Florida Constitution. As I stated in Butler,
Florida's exclusion of the death penalty from the requirement of jury unanimity cannot be reconciled with the United States Supreme Court's recognition in Ring that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death," and its holding that "the Sixth Amendment applies to both." [536 U.S. at 609, 122 S.Ct. 2428] (emphasis supplied). The right to trial by jury in Florida would be senselessly diminished if the jury is required to return a unanimous verdict on every fact necessary to render a defendant eligible for a penalty with the exception of the final and irrevocable sanction of death.
. . . .
. . . Simply put, the requirement of jury unanimity for proving every other element of a criminal offense in Florida, except for the critical element required in order to impose the death penalty, is not constitutionally justified in light of Ring.

842 So.2d at 838 (Pariente, J., concurring in part and dissenting in part).
Therefore, I would vacate Coday's death sentence not only for the reasons in the majority opinion, but also because the jury did not unanimously find that a single aggravating factor was proved beyond a reasonable doubt.

II. Requiem for an Interrogatory
Apart from capital cases, jury interrogatories on findings that authorize sentence enhancement or reclassification are favored in Florida law. See, e.g., State v. Hargrove, 694 So.2d 729, 731 (Fla.1997) (stating that a "specific question or special verdict form is the clearest way by which the jury can make the finding necessary to support [a firearm] enhancement"). Cases coming before us on direct appeal in the past few years have demonstrated that after Ring, interrogatories on specific aggravating circumstances were used with greater frequency in capital cases as well.[29] *1024 However, that option is now foreclosed by this Court's holding in Steele that "a trial court departs from the essential requirements of law in a death penalty case by using a penalty phase special verdict form that details the jurors' determination concerning aggravating factors found by the jury." 921 So.2d at 548.
But for Steele's holding prohibiting special interrogatories in the penalty phase, we would be able to tell when a jury has unanimously found a death-qualifying aggravating circumstance, which would both facilitate our proportionality review and satisfy the constitutional guarantee of trial by jury even when the recommendation of death is less than unanimous. In this respect, Steele makes capital sentencing less transparent, less conducive to appellate review and therefore, ultimately less fair and reliable. The Court should recede from its ban on penalty phase interrogatories on aggravating circumstances.

III. Capital Sentencing Reform
Finally, I write to reiterate this Court's suggestion to the Legislature regarding revision of our capital sentencing statute. In Steele, this Court recommended that the Legislature revisit our capital sentencing statute and consider whether "to require some unanimity in the jury's recommendations." 921 So.2d at 548. As noted in the majority opinion authored by Justice Cantero, "Florida is now the only state in the country that allows the death penalty to be imposed even though the penalty-phase jury may determine by a mere majority vote both whether aggravators exist and whether to recommend the death penalty." Id. at 550. We suggested in Steele that the Legislature consider requiring unanimous findings of aggravators and a unanimous jury recommendation. Id.[30] As noted in the Steele majority opinion, seven states require at least that the aggravators be determined unanimously. Id. at 548. Florida could do the same while still requiring only a majority of the jurors to recommend death in order for that penalty to be imposed.
Further, there appears to be some confusion as to how a requirement of jury unanimity would operate in the penalty phase. Under the current system, the jury is informed that its advisory sentence need not be unanimous, and is not encouraged to deliberate at length before making its recommendation. See Fla. Std. Jury Instr. (Crim.) 7.14. If unanimity were required on either the existence of aggravators or the penalty recommendation, jurors could be required to deliberate until they reached agreement or informed the Court that they were deadlocked, as with guilt-phase deliberations. The Legislature could provide that in the rare case in which jurors cannot agree on a death-qualifying aggravating circumstance (or the penalty if a unanimous recommendation is required), a new penalty-phase jury *1025 should be impaneled or, in the alternative, a sentence of life imposed.
Accordingly, reform bringing Florida closer to the mainstream of capital sentencing states in regard to jury findings could take one of several paths. I again encourage the Legislature to reexamine section 921.141 in light of Ring, Steele, article I, section 22, and this case.
CANTERO, J., concurring in part and dissenting in part.
I concur in affirming Coday's conviction, but I respectfully dissent from the majority's decision to vacate his death sentence. The majority does so based on his experts' testimony that his capacity to conform to the requirements of law was substantially impaired. The trial judge, who was in a much better position than we are to determine the experts' credibility, rejected their testimony. He did not abuse his discretion in doing so. First, competent, substantial evidence demonstrates that Coday had the capacity to conform to the requirements of law; and specifically, that he carefully planned the encounter with his victim and its aftermath. Second, much of the experts' testimony was based on Coday's own self-reports, and therefore the trial court was within his discretion to reject it.
Below, I explain the standard for determining whether a trial court may reject uncontradicted expert testimony. Next, I address the evidence supporting the trial court's decision and then the evidence supporting his rejection of the mental health experts' opinions.

A. TRIAL COURT REJECTION OF MITIGATION
Whether a mitigator has been established, and the weight to ascribe to it, are matters within the trial judge's discretion. Campbell v. State, 571 So.2d 415, 420 (Fla. 1990). In fact, we have stated that "[a] trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent substantial evidence to support the rejection." Mansfield v. State, 758 So.2d 636, 646 (Fla.2000). When the asserted mitigating circumstance is based solely on expert testimony, the trial judge has even wider discretion because expert testimony is not binding. Walls v. State, 641 So.2d 381, 390 (Fla.1994). A trial court may reject mitigation based on expert testimony, even if that testimony is uncontroverted, "where it is difficult to square with the other evidence in the case." Morton v. State, 789 So.2d 324, 330 (Fla.2001). As we stated in Walls, "[o]pinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking. A debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve." 641 So.2d at 390-91.
The majority concludes that the "evidence offered by the State to counter this mitigation evidence can be squared with the expert testimonies." Majority op. at 1005. As I demonstrate below, however, the evidence presented at least made that factor debatable. Therefore, the judge was well within his discretion in rejecting it.

II. THE CONFLICTING EVIDENCE
The trial court found that the testimony of the six mental health experts supported a finding that when Coday murdered Gloria Gomez, he was under the influence of extreme mental or emotional disturbance. He assigned that mitigator moderate weight. However, he rejected the mitigating factor that Coday's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of *1026 law was substantially impaired. These two findings are consistent.
In rejecting the mitigating factor, the trial court noted that when Coday murdered the victim, his former girlfriend Gloria Gomez in 1997, he had conducted himself without incident since he had killed another former girlfriend, Lisa Hullinger (under suspiciously similar circumstances) in 1978. In fact, during that period of nearly twenty years, Coday underwent therapy, obtained a law degree, and held professional jobs. On a personal level, he dated and had romantic relationships, married twice, divorced once, separated from his second wife, and maintained long-term friendships. In his first marriage, he was unable to perform sexually after the first month. As for his second marriage, Coday married his wife in 1995 after living with her for six years. She ultimately left him because of his affairs with other women. Clearly, Coday had a life of ups and downs and difficulties in his relationships, but throughout those nineteen years he evidenced a capacity to conform his behavior to the requirements of law.
More particularly, the evidence about the events surrounding the murderCoday's planning of his meeting with Gloria, the circumstances of the meeting itself, and his getawaydemonstrate that when he murdered her he knew exactly what he was doing. His capacity to conform his conduct to the requirements of law was impaired only to the extent one can conclude that about anyone planning and committing a murder. After Gloria, the victim in this case, left him at the beginning of June 1997 and refused to communicate with him, Coday was distressed. He was even more distressed to learn that she was living with her new boyfriend and his family. Nevertheless, he traveled on business and otherwise performed his job well without missing any work days. As recited by the majority, on the day before the murder, July 10, Coday reserved a flight for July 12 from New York to Paris and withdrew a substantial amount of money from his bank account. See majority op. at 995-96. Although he had unused vacation time, he did not request time off, nor did he tell anyone at work of any plan to leave the country and his job. In fact, on his last day at work, he gave no hint to his coworker, who said Coday was like a son to her, that he would never return.
Because Gloria refused to see him, Coday planned to tell her a lie designed to gain her sympathy and lure her to his apartment: he told her he was suffering from cancer and was going into the hospital. Gloria agreed to see him. According to Coday's confession (much of which, in later talking with his experts, he conveniently forgot), Gloria arrived between 1:00 and 2:00 p.m. on July 11the day before his flight from New York to Paris. Brushing aside discussion of his fraudulent illness, Coday sought to reestablish their relationship. When Gloria made it clear that she was only there to help him through his medical crisis, Coday decided to take her into his bedroom, where a hammer coincidentally rested on his bedside table. There he claims to have begged her to restore their relationship, and she responded that she had not loved him the way he thought. At this point, Coday picked up the hammer and attacked her. She tried to defend herself. When he slipped and fell, she took the hammer from him. Coday then rushed to another room to retrieve another hammer and returned to attack her again. When he had finished beating her with it, she was still alive. This time he went to the kitchen, retrieved a knife, and attacked her yet again. After three separate attacks on her, in which Coday hit her fifty-seven times with two hammers and stabbed her *1027 eighty-seven times with the knife, Gloria finally succumbed.
As the majority acknowledges, this evidence "establish[es] that the murder was premeditated and not committed in the heat of passion." Majority op. at 996. But it also necessarily supports the rejection of Coday's claim that his capacity to conform to the law was substantially impaired. This is particularly evidenced by the control he had over his own actions. Even if one accepts Coday's improbable claim that the hammer he first used on Gloria (the same type of weapon he used to kill another former girlfriend) was lying on his bedside table by pure coincidence, such fortuity cannot be ascribed to his other weapons. When Gloria took the first hammer from him, Coday did not use his bare hands or another item within easy reach. Instead, he twice left to another room to obtain weaponsfirst another hammer and then, when that did not kill her, a knifeand persisted in the attack.
At least one expert testified that Coday knew he was attacking Gloria, that he knew that his actions were injuring her, and that he knew his actions could kill her. Coday himself said that he was aware she was dying and heard her speak her last words. According to Coday, he immediately returned to "normal" when she died. He was so "normal," in fact, that he took immediate actionnot to call the police or an ambulance, but to escape. He showered, changed clothes, retrieved what he claimed were his previously packed bags, took Gloria's purse and car, and drove to the Miami airport. He bought a plane ticket and by 5:30 p.m.three-and-a-half to four-and-a-half hours after Gloria first arrived at his apartmenthe was on a flight to New York. His seatmate on the plane testified that his behavior was unremarkable. The following day, Coday flew to Paris.
This evidence shows that despite his emotional turmoil, Coday demonstrated a great deal of control over his actions from beginning to end and that his capacity to conform his behavior to the requirements of law was not substantially impaired, except to the extent one can say that about anyone who just planned and committed murder.
Other evidence, pertaining to Coday's 1978 murder of Lisa Hullinger, also shows that his capacity to conform was not impaired.[31] Coday and Lisa met as students in Germany. When they returned to United States, although they lived in different parts of the country, they continued their relationship. In the winter or spring of 1978, Lisa severed the relationship, however, and in late August she returned to Germany. Coday traveled to the German town where she lived and rented a room in her neighborhood. In September, he invited Lisa to his room, hoping to reestablish their relationship. During their conversation, Lisa told him she had another boyfriend and no longer loved him. Coday left the room, obtained a hammer, returned, and struck her repeatedly in the head. She later died. He was imprisoned in Germany for that crime.
Thus, in June and July of 1997, when Coday was experiencing Gloria's detachment from him and lied to her about his condition, he knew that in eerily similar circumstances he had killed another former girlfriend who had left him. In fact, in the letter he wrote to Gloria after her murder, he stated that several days before he murdered her he considered pursuing *1028 therapy to deal with their breakup, but ultimately rejected the option as too expensive and time-consuming.
Thus, substantial, competent evidence demonstrated that Coday murdered Gloria not because his "resentment and rage overpowered his ability to reason," majority op. at 1004, but because he reasoned himself into a rage. He had decided to lure Gloria into his apartment and either convince her to reunite with him or make sure that she was never again united with anyoneincluding her current boyfriend. He then carefully planned the events of that day and his subsequent escape, from faking cancer, to luring her to his apartment, to placing hammers in the apartment, to withdrawing money from his bank account, to buying a plane ticket from New York to Paris, to having his bags packed and ready to goall to effectuate his contingency plan. If Coday indeed flew into a rage when Gloria shunned him, as he said, it was only because he had planned to do so. If these circumstances demonstrate an inability to conform conduct to the requirements of law, then every murder involving repeated stabbings, or beatings with a blunt instrument, must necessarily include this mitigator.

III. THE EXPERT MENTAL HEALTH EVIDENCE
It is true that six separate mental health experts testified that Coday's ability to conform to the requirements of law was impaired. But their testimony was based almost totally on Coday's own reporting to them, and ignored the many facts that clearly demonstrated that Coday's actions were deliberately and carefully planned.
The experts testified that Coday's capacity to conform to the requirements of law was substantially impaired only from the time he picked up the first hammer until Gloria diedthat is, only for the time it took for him to obtain three different weapons and inflict almost 150 injuries.[32] They testified that Coday was in a "dissociative state" when he attacked and murdered Gloria, which substantially impaired his ability to conform to the requirements of law during the murder.
The experts largely based their opinions about Coday's dissociative state on Coday's self-reports. According to the experts, a person in a dissociative state feels detached from a traumatic experience, as if watching it occur. Several of the expertsDrs. Seligson and Walker, for exampleconcluded that Coday was in this state because when they interviewed him, Coday said he could not remember what happened during the crime and even expressed surprise and cried upon hearing the facts. Dr. Goldstein testified that Coday remembered more details of the crime with him because memories return over time. However, Coday's confessionwritten about three months after the crime and long before he met any of these expertsprovides a detailed account from the moment he felt himself "entering a state of shock" upon learning that Gloria did not love him the way he thought she did:
I hit her with my fist. I went and picked up a hammer lying in my bedroom on top of the yellow pages. I struck her on the head. She fell. I swung again, yelling, screaming, and lost my balance. I landed on top of her. *1029 She grabbed the hammer from my hand. I went and picked up another hammer and struck her again. She was bleeding and trying to get up. She screamed and kicked me. I had gotten a knife lying on the kitchen top (I don't remember exactly when) came back and began to stab her. We both were screaming. She scratched me but I stabbed her in the neck then held the knife there. She reached out and held my arm. I heard her mutter some words, but I don't know what she said. Then her hand let loose of mine. I knew she was dead.
We have held that a defendant's self-reports, especially those unsupported by the record, serve as a basis for rejecting expert testimony. See Nelson v. State, 850 So.2d 514, 530 (Fla.2003) (affirming the trial court's rejection of uncontroverted expert opinion testimony that the defendant was suffering an extreme mental or emotional disturbance, where the evidence supporting this opinion was largely the defendant's self-report of symptoms to the doctor). Because the experts' conclusions about Coday's dissociative state were based on his self-reports, the trial court was free to reject them.
Coday's self-reports were also unreliable because they were self-contradictory. His memory of the crime varied from expert to expert and from interview to interview. At least two doctors gave alternative explanations for his memory loss. Dr. Goldstein testified that Coday's memory loss in the interviews could have resulted from repressing the memory because of the traumatic nature of the incident, not mental illness. And Dr. Seligson testified that Coday's inability to recall what happened "was certainly either some kind of memory blocking, or else he was in a dissociative state at the time the incident occurred." (Emphasis added.)
Drs. Seligson, Walker, and Jacobson also based their opinions about Coday's dissociative state on his reporting that he felt he was watching himself, and several experts relied on Coday's reports of "hearing voices" or having hallucinations at the time of both murders. Thus, the experts' opinions that Coday was substantially unable to conform his conduct were based largely on what Coday reported he heard or felt or variously remembered.
The experts also contradicted each other about the level of Coday's detachment or dissociation at the time of the murder. Dr. Jacobson testified that during the murder Coday did not see Gloria as a human being but as the "personification of a person who was injuring him" and this constituted a loss of reality. Dr. Goldstein, however, testified that Coday did not murder Gloria "in a totally detached way." He testified that at the time of the murder, Coday specifically knew he was attacking Gloria, knew that he was hitting her with a hammer, knew that his attack was causing injury and pain, and knew that what he was doing could result in Gloria's death. This testimony suggests Coday did not lose touch with reality whatsoever. In addition, when joined with evidence of Coday's control over his actions during the attacks, such evidence contrasts sharply with expert testimony that Coday was unable to control himself during the actual murder. Further, Dr. Goldstein said that Coday was not insane at the time of the murder and admitted that even people who are not mentally ill may allow their emotions to overwhelm their rationality. He conceded that killing out of anger is not mitigation.
Finally, the majority finds significant that no lay witnesses testified that Coday had been involved in "stressful relationship-based incidents" in which he was able to cope. Majority op. at 1005. Although *1030 the lay witnesses did not testify to such incidents, one expert did. Dr. Walker testified as follows:
[Coday] does not have memory, at least he didn't when I evaluated him[,] of the actual homicide itself. He remembers the voices and the same voices of the girls laughing at him and humiliating him, and feeling the same way that he had felt at other times.
He describes feeling that way at several other times when other women that he had a relationship with, had rejected him, and he felt rejected, but was able to contain himself, and exactly why he could contain himself at other times, and not at this time, I think was in the relationship, and in the actual dynamics of the relationship, rather than in his mental illness and an ability to deal with the dynamics of that relationship.
Thus, not only did Coday cope with breakups in other romantic relationships despite feeling rejected, hearing voices, and experiencing the humiliation he felt with Gloria, but Dr. Walker explained that Coday's inability to cope this time did not stem from Coday's mental illness. Dr. Walker's conclusion that the on-again, off-again nature of Coday's relationship with Gloria was like that which he had with Lisa Hullinger also is based on Coday's reports.[33]
In his concurring opinion, Justice Bell apparently rejects Coday's admission that he maintained control in similar scenes of romantic rejection by women in which he experienced the same feelings. Concurring op. at 43. Relying on Dr. Walker's explanation that the on-again, off-again nature of Coday and Gloria's relationship resulted in Coday's violent reaction, Justice Bell asserts that "the record reflects only three incidents of romantic rejection and each was followed by a psychotic episode." This conclusion is based on testimony by several of the experts likening Coday's attempted suicide in jail after receiving divorce papers to his two prior violent responses to rejection and abandonment in a romantic relationship. However, the nature of Coday's relationship with his estranged wife was not like his relationships with the former girlfriends he killed. Coday separated from his estranged wife before he met Gloria. Long before he attempted suicide, he and his estranged wife, no longer romantically involved, had become friends. In fact, though still married to her, Coday sought her advice when Gloria broke up with him. Further, according to Dr. Walker, when Coday received the divorce papers, he thought he already had divorced his estranged wife. There was no on-again, off-again relationship and no romancethe purported determinative factors necessary to spark a violent reaction. Dr. Walker's opinion can therefore be rejected not only because it is based on Coday's reports of the nature of the relationships but also because the suicide attempt disproves her conclusion.
As I noted above, a trial court is free to reject even uncontradicted expert testimony "where it is difficult to square with the other evidence in the case." Morton, 789 So.2d at 330. The majority cites only one case in which we have reversed a trial court's rejection of uncontroverted expert *1031 testimony. Majority op. at 1002; see Crook v. State, 813 So.2d 68 (Fla.2002). The evidence in that case, however, was far stronger, and far more independently verifiable, than the evidence presented here. In Crook, the medical experts performed a series of tests, conducted clinical evaluations, and reviewed Crook's school and medical records. For example, a neurologist determined after testing that damage to Crook's frontal lobe impaired his brain function, resulting in part in an impulse control disorder. Id. at 71-72. Thus, not only did experts testify about the defendant's frontal lobe brain damage; their testimony was based on evidence other than the defendant's self-reporting, including evidence of the causes of the brain damage and objective testing. In contrast, in this case the experts' conclusions on the presence of the impaired capacity mitigator were based on what Coday told them.

III. CONCLUSION
The evidence in this case supports the trial court's rejection of the experts' testimony that Coday was substantially unable to conform his conduct to the requirements of law. The experts based their opinions on their conclusions that Coday was in a dissociative state at that time of the murder. These conclusions in turn were based on Coday's various reports about his memory of the murder and feeling detached at the time. Others also relied on Coday's statements that he heard voices. As a result, these opinions lack sufficient basis and cannot be squared with the evidence of Coday's ability, over a period of twenty years and several failed relationships, to conform his conduct to the requirements of law, not to mention his planning and execution of the murder and his escape from it. The trial court was well within its discretion in rejecting their testimony.
I recognize that the ultimate result in this casea sentence of deathmay not change on remand. As the majority notes, the trial judge will be free to reevaluate the sentence, finding the mitigator but assigning it whatever weight the judge deems appropriate. The majority even implies that the judge may give the mitigator no weight at all "when that circumstance is not mitigating based on the unique facts of the case." Majority op. at 1003; see also Trease v. State, 768 So.2d 1050 (Fla.2000) (holding that in some circumstances a trial court may give no weight to a mitigating circumstance). Thus, to a large extent this may ultimately be an academic exercise. Nevertheless, the majority's holding sets a troubling precedent. With the exception of Crook v. State, which I have already distinguished as involving vastly different circumstances, this Court has never, until now, held that a trial court was required to give weight to uncontradicted expert testimony that the judge has found inherently incredible.[34] Today this Court removes much of the discretion previously granted to trial judges in determining the credibility of expert witnesses. Taken at face value, the Court's holding, which is not limited to the capital context, will have unintended but serious repercussions in other criminal and civil trials. As we see day after day in this Court, defendants can always find experts to testify that mental health mitigation exists; and expert psychological testimony based on a defendant's self-reporting will *1032 be difficult to contradict, since it will be based on the defendant's own version of the story. Therefore, many times such testimony will necessarily go unrebutted. But under the Court's holding today, that testimonyno matter how ludicrous, improbable, or divorced from realitymust now be accepted.
For these reasons, although I concur in affirming the conviction, I dissent from the majority's remand to the trial court for reevaluation of the sentence.
WELLS, J., concurs.
NOTES
[1] Also known as William Edward Coday, Jr.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] Robinson v. State, 761 So.2d 269 (Fla.1999) (upholding the trial court's rejection of brain damage as significant mitigation because of insufficient evidence it caused defendant's conduct).
[4] This standard seems more appropriate in the insanity context where a determination is being made concerning the defendant's legal responsibility for the offense. As provided by Florida law, insanity is established when:

(a) The defendant had a mental infirmity, disease, or defect; and
(b) Because of this condition, the defendant:
1. Did not know what he or she was doing or its consequences; or
2. Although the defendant knew what he or she was doing and its consequences, the defendant did not know that what he or she was doing was wrong.
§ 775.027, Fla. Stat. (2005).
[5] Because we are vacating the sentence, we do not address the issue of proportionality.
[6] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[7] In Steele, we reiterated that there is no statute, rule of procedure, or decision from this Court or the United States Supreme Court that compels a trial court to require advance notice of the aggravating circumstances the State will rely on to support imposition of a sentence of death. However, we nonetheless found that a trial court does not depart from the essential requirements of the law by requiring the prosecutor to give advance notice of the aggravating circumstances.
[8] In August of 1978, Coday went to Germany as part of a student exchange program and became involved with another American exchange student named Lisa Hullinger. For mental reasons, he was unable to perform sexually with her, and this caused a rift in their relationship. Hullinger eventually started dating another man, named Mike, because Coday was unable to perform sexually. On September 12, 1978, Coday invited Hullinger over to his residence to have a heart-to-heart discussion. When she revealed the details of her relationship with Mike and disclosed to Coday that she did not love him anymore, Coday went into the basement of the home where he was residing, grabbed a hammer from a toolbox, returned to his bedroom, and beat her about the head until she became unconscious. Hullinger later died at the hospital of injuries stemming from this incident. For this crime, Coday was convicted of manslaughter and sentenced to three years in jail. The German court reduced the charge to manslaughter because he had no criminal record and deeply regretted committing the crime.
[9] Although this case is referred to as Furman v. Georgia, the case consists of three cases (two from Georgia and one from Texas, Furman v. Georgia; Jackson v. Georgia; Branch v. Texas). In the three cases the defendants were convicted of murder, rape, and rape, respectively, and each defendant was sentenced to death. The question that was presented to the court was whether the imposition and execution of the death sentence in each of those cases would constitute cruel and unusual punishment in violation of the Eighth Amendment.
[10] Thereafter, the Supreme Court invalidated the Illinois death penalty statute in Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). In a number of opinions that followed Furman and Moore, the Supreme Court invalidated death sentences imposed in twenty-six states, including several sentences imposed in Florida. This Court then invalidated all unexecuted death sentences in this State which were imposed under the statute as it existed at the time of Furman. See Anderson v. State, 267 So.2d 8, 10 (Fla.1972).
[11] The five justices who concurred in the judgment to reverse the death sentence in each case were Justices Douglas, Brennan, Stewart, White, and Marshall. All five authored separate opinions.
[12] The bifurcation of capital trials was recommended by the drafters of the Model Penal Code as a method of getting before the jury all of the information that bears on the appropriate sentence without compromising the defendant's right to a fair determination of guilt or innocence. See Model Penal Code § 201.6 cmt. 5 (Tent. Draft No. 9, 1959).
[13] The Georgia scheme provided for ten statutory aggravating circumstances, one of which must be found before a sentence of death could be imposed. In addition the jury could consider any other of the aggravating circumstances and any mitigating circumstances. Moreover, the jury did not have to find a mitigating circumstance before it could make a binding recommendation of mercy. In cases involving a jury, the judge was bound by the recommendation of the jury. The scheme provided for automatic review by the Georgia Supreme Court, which had to engage in a proportionality analysis. See Gregg v. Georgia, 428 U.S. 153 196-98, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (explaining Georgia's capital sentencing procedure); see also Ga. Code Ann. §§ 17-10-30,-31,-35 (2004 & Supp.2006).
[14] The revised statute became effective on December 8, 1972.
[15] At that time both first-degree murder and rape were capital offenses. The Supreme Court has since determined that the death penalty when applied to the crime of rape is cruel and unusual because it is grossly disproportionate and excessive. See Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); see also Buford v. State, 403 So.2d 943 (Fla.1981).
[16] The four cases are State v. Dixon (which was itself a consolidation of three cases), State v. Setser, State v. Hunter (a consolidation of two cases), and State v. Sheppard.
[17] The Supreme Court accepted certiorari review of Gardner and held that the defendant was denied due process when the death sentence was imposed in part on information contained in a presentence investigation report that the defendant did not have an opportunity to deny or explain. See Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).
[18] The Court decided Proffitt v. Florida on the same day it decided Gregg v. Georgia, and upheld the constitutionality of each death penalty statute.
[19] 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that the defendant had the right to place before the sentencing jury all relevant evidence offered in mitigation).
[20] 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (holding that the defendant is entitled to individualized consideration of mitigating factors, the State cannot preclude the introduction of the proffered evidence, and the sentencer cannot refuse to consider the proffered evidence).
[21] 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (finding that the sentencer cannot be precluded from considering any aspect of the defendant's character or record and any circumstances of the offense in mitigation of sentence).
[22] In Baxter v. Thomas, 45 F.3d 1501 (11th Cir.1995), the Eleventh Circuit Court of Appeals found a defendant suffered prejudice when his counsel failed to conduct a reasonable investigation into the defendant's background. The court said the psychiatric mitigating evidence could totally change the dynamics of a penalty phase.
[23] The Supreme Court cited to the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial. Rompilla, 125 S.Ct. at 2466. The pertinent ABA Standard provided:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.
1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).
[24] Although we cited to the Wiggins case in our discussion of counsel's duty to fully investigate and prepare for the penalty phase of a capital proceeding, we noted that we recognized this duty long before Wiggins was decided. Orme, 896 So.2d at 731; see, e.g., State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002); Ragsdale v. State, 798 So.2d 713 (Fla.2001); Asay v. State, 769 So.2d 974, 985 (Fla.2000); Rose v. State, 675 So.2d 567 (Fla.1996); Stevens v. State, 552 So.2d 1082 (Fla.1989).
[25] Initially, Dr. Martha Jacobson was appointed as an expert at the prosecution's request. However, her assessment of Coday was almost identical to the defense's experts, and she then became a defense witness. Additionally, Dr. Lenore Walker is an expert on, and the originator of, Battered Women's Syndrome. She does not typically testify on behalf of men who have beaten women, but after reviewing the file she was compelled to present expert testimony on Coday's mental status on his behalf.
[26] In his dissent, Justice Cantero takes issue with the fact that a great deal of the information on which the experts relied was self-reported by Coday. Dissenting op. at 1025, 1028. While it is true that some of the experts only spoke to Coday in forming their opinions, some relied on information gained from interviews with various individuals regarding Coday, while other experts administered tests designed to address malingering.

Dr. Goldstein conducted extensive interviews with others than Coday, including interviews with Coday's mother, father, two exwives, former girlfriend, and coworker from the Broward County Library. Dr. Seligson also interviewed Coday's mother. Information gained from these interviews was placed in a common file to which all of the experts had access. All of the experts state that they reviewed various resources other than their own test results. Drs. Walker and Goldstein specifically stated that they relied on the common file, including this interview information, in forming their opinions. At least two of the experts, Drs. Shapiro and Goldstein, discussed tests given to Coday to address malingering. Both experts concluded that Coday was not malingering.
[27] The record provides no details of Coday's psychotic episode while in law school other than that his father flew out to see him in response. However, evidence was presented that Coday had choked his first wife while angry but his mother pulled him off and that Coday had grabbed and kicked his second wife while angry but that she got away. Coday claimed at the time of the incidents, and during his psychological evaluations, to have no memory of his actions. This testimony did not contradict the expert testimony.
[28] See, e.g., Seibert v. State, 923 So.2d 460, 474 (Fla.2006) (relying on prior violent felony aggravator to reject Ring claim in direct appeal); Anderson v. State, 863 So.2d 169, 189 (Fla.2003) (relying on prior violent felony aggravator and unanimous death recommendation in direct appeal); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003) (relying on prior violent felony aggravator to reject Ring claim in direct appeal); Lugo v. State, 845 So.2d 74, 119 n. 79 (Fla.2003) (relying on unanimous guilty verdict on other felonies and "existence of prior violent felonies" in postconviction appeal); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (relying on prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury in direct appeal).
[29] In my separate opinion in Steele, I cited three cases in which juries unanimously found aggravating circumstances on special verdicts provided by the trial court, enabling this Court to conclude that each juror had found at least one aggravating circumstance beyond a reasonable doubt. See 921 So.2d at 554 (Pariente, C.J., concurring in part and dissenting in part). In one case, the jury unanimously found all five aggravators beyond a reasonable doubt but recommended death by a vote of only nine to three. See Huggins v. State, 889 So.2d 743, 753 (Fla. 2004), cert. denied, 545 U.S. 1107, 125 S.Ct. 2546, 162 L.Ed.2d 280 (2005). In another, not cited in Steele, the jury unanimously found the single aggravator of previous conviction of a violent felony but recommended death by a vote of only eight to four. See Rodgers v. State, No. SC04-1425, ___ So.2d ___, at ___, 2006 WL 3025668 (Fla. Oct. 26, 2006).
[30] A recent report on Florida's death penalty system by the American Bar Association makes essentially the same recommendation. See American Bar Association, Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report (Sept. 2006) at 306 ("The State of Florida should require that the jury's sentencing verdict in capital cases be unanimous and, when the sentencing verdict is a death sentence, that the jury reach unanimous agreement on at least one aggravating circumstance.").
[31] For reasons unimportant here, this evidence was not presented as a prior violent felony conviction, but because the mental health experts relied on it to support their opinions.
[32] The majority criticizes the trial court for "confus[ing] the standard for insanity with the mental mitigation in question." Majority op. at 1003. However, I think the trial court's statement that the mental health testimony did not demonstrate that Coday was relieved of responsibility for the murder was directed at the testimony of several mental health experts that Coday was insane at the time of the murder.
[33] Dr. Walker testified about Coday's claims of the similarities between the two relationships: "When you talk to Mr. Coday, he will say the same psychological issues occurred, that same back and forth . . . until finally he snapped." Contrary to Coday's theories, however, the evidence shows that Lisa broke off the relationship the winter or spring before he coincidentally traveled (the following August) to the German town where Lisa was studying. Lisa, who had a boyfriend, was cordial to Coday but kept her distance and did not renew their relationship.
[34] In another case, a plurality of the Court found error in a trial court's rejection of mental health expert testimony on the factors of extreme mental or emotional disturbance and impaired capacity. See Spencer v. State, 645 So.2d 377 (Fla.1994). The dissent noted that the trial court rejected the factors because the evidence did not show that alcohol or drug use impaired the defendant at the time of the murder. Id. at 385-86.